IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) | |
| | ) | Civil Action No: 5:19-CV-4063 |
| Plaintiff, | ) ) | |
| | ) | Hon. Judge Linda R. Reade |
| v. | ) | |
| | ) | |
| SCHUSTER CO., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF EEOC'S MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE
TESTIMONY OF SCHUSTER'S EXPERT WITNESS DR. CHESTER HANVEY**

# Table of Contents

I.    Factual Background ............................................................................................. 1

II.   Legal Standard .................................................................................................... 3

III.  Argument ............................................................................................................ 5

  A.  Dr. Hanvey's Opinion that the CRT Test Caused a Reduction in Workers' Compensation Costs Is Not Based on the Application of Reliable Principles or Methods ............................ 5

    1.  Establishing Criterion Validity ................................................................ 6

    2.  Dr. Hanvey Performed No Statistical Analysis as Required by UGESP and the SIOP Principles. ........................................................................................ 7

    3.  Dr. Hanvey Assumes the CRT Test Prevents a Far Broader Range of Injuries than the Test Developer Claims the Test Can Prevent. ........................... 8

    4.  Dr. Hanvey's Opinion that the CRT Test Reduced MSD Injury Costs Is Not Supported by His Own Analysis. ....................................................... 11

    5.  Dr. Hanvey's Analysis of Injury Data Is Not Appropriate Expert Testimony. .............. 13

  B.  Dr. Hanvey's Opinion that the DCI Study Provides Transportability Evidence Does Not Adhere to the Principles in the Uniform Guidelines or SIOP. .............................. 15

    1.  Dr. Hanvey Cannot Say that the DCI Study Clearly Demonstrates that the Test is Valid at Company A. .......................................................... 16

    2.  Dr. Hanvey Does Not Know Whether the Positions at Company A and Schuster are Substantially the Same. ......................................................... 16

    3.  There Is No Evidence of Fairness. ........................................................ 18

  C.  Dr. Hanvey's "Literature Review" Does Not Support His Opinion. .................... 18

  D.  Dr. Hanvey's Opinion that the CRT Test Caused a Reduction in MSD Injury Costs Based on Cumulative Evidence Is Unreliable ..................................... 19

IV.   Conclusion ......................................................................................................... 20

# Table of Authorities

**Page(s)**

**Cases**

*Anderson v. Raymond Corp.*,
    340 F.3d 520 (8th Cir. 2003) ................................................................................3

*Chen-Oster v. Goldman, Sachs & Co.*,
    114 F. Supp. 3d 110, 123-124 (S.D.N.Y. 2015) ...................................................13

*Chen-Oster v. Goldman, Sachs & Co.*,
    325 F.R.D. 55 (S.D.N.Y. 2018) ...........................................................................14

*David E. Watson, P.C. v. United States*,
    668 F.3d 1008 (8th Cir. 2012) ................................................................................4

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993) ...................................................................................... *passim*

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) ...........................................................................................4, 11

*Hoekman v. Education Minnesota*,
    335 F.R.D. 219 (D. Minn. 2020) ........................................................................7, 8

*Lanning v. Se. Pa. Transp. Auth.*,
    181 F.3d 478 (3rd Cir. 1999) ................................................................................15

*Littler v. Ohio Association of Public Edu. Employees*,
    Case No. 2:18-cv-1745, 2020 WL 1861646 (N.D. Ohio April 14, 2020) ...............8

*Marmo v. Tyson Fresh Meats, Inc.*,
    457 F.3d 748 (8th Cir. 2006) ..................................................................................4

*Nebraska Plastics, Inc.v. Holland Colors Americas, Inc.*,
    408 F.3d 410 (8th Cir. 2005) ..................................................................................8

*In re Wholesale Grocery Prods. Antitrust Litig.*,
    946 F.3d 995 (8th Cir. 2019) ..............................................................................4, 8

*In re Zurn Pex Plumbing Prods. Liab. Litig.*,
    644 F.3d 604 (8th Cir. 2011) ..................................................................................5

**Other Authorities**

29 C.F.R. §§ 1607.5(B) ..............................................................................................6

iii

29 C.F.R. § 1607.7(B) ..................................................................................................15

29 C.F.R. § 1607.7(B)(2) .............................................................................................17

29 C.F.R. § 1607.7(B)(3) .............................................................................................18

29 C.F.R. § 1607.14(B) ..................................................................................................6

29 C.F.R. § 1607.14(B)(5) ..............................................................................................6

29 C.F.R. § 1607.16 .......................................................................................................6

Fed. R. Evid. 702(a) ........................................................................................................3

Fed. R. Evid. 702(b)-(d) .................................................................................................4

Fed. R. Evid. 702(c) ........................................................................................................5

Federal Rule of Evidence 702 ...............................................................................1, 3, 13

iv

**PLAINTIFF EEOC'S MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE**
**TESTIMONY OF SCHUSTER'S EXPERT WITNESS DR. CHESTER HANVEY**

Defendant has offered the expert testimony of Dr. Chester Hanvey, an industrial/organizational psychologist who claims to have examined the use of the CRT test at Schuster and to have found it "valid" as a selection tool that aims to lower the cost of workers' compensation injuries. Expert testimony should be based on sound scientific principles and should be relevant to the issues of the case. The field of industrial/organizational psychology relies on certain well-established principles found in the government's Uniform Guidelines on Employee Selection Procedures ("UGESP") and the Society for Industrial Organizational Psychology's Principles for the Validation and Use of Personnel Selection Procedures ("SIOP Principles"). These documents set out specific standards to be used when validating selection procedures. Because Dr. Hanvey's work frequently departs from these methods and standards, it fails to meet the requirements of Federal Rule of Evidence 702 as well as *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993) and its progeny, and should therefore be barred.

**I.     Factual Background**

EEOC alleges in this enforcement action against Schuster Co. ("Schuster") that since at least June 2014, Schuster has subjected Charging Party Linda Kim and a class of aggrieved female job applicants to a sex discriminatory physical abilities test developed by CRT that resulted in those job applicants being denied employment opportunities because of their sex, female, in violation of Title VII. The CRT test is an isokinetic test that purports to measure an individual's knee, shoulder, and trunk strength. Ex. 3, CRT Substantive Rule 30(b)(6) Dep., 35:18-36:5. A test taker performs shoulder, knee, and trunk flexions and extensions on an apparatus called the ET2000. Ex. 9, ET2000 Instruction Manual at EEOC0000162-3

1

(EEOC0000158-67). The CRT test collects component data related to the test-taker's knees, shoulders, and trunk and generates an overall body index score ("BIS") for each test taker. Ex. 3, CRT Substantive Rule 30(b)(6) Dep., 35:18-36:5. Since at least June 2014 to the present, Schuster has required applicants who have received conditional offers of hire for driver positions to achieve a BIS of 151 on the CRT test and revokes the conditional offer of hire of anyone who obtains less than a 151 score. Doc. 23, ¶¶ 14, 16; Ex. 10, Body Index Scores Correlated to Schuster Co. (Schuster 0036); Ex. 11, Arens Dep., 106:16-107:11. Ex. 12, Schuster Vol. 1 Dep., 84:2-13. As EEOC's expert, Dr Erin George found, the CRT test has a statistically significant disparate impact on women. Ex. 13, George Report at 5, ¶19; Ex. 14, George Decl., ¶ 7.

Schuster retained Dr. Hanvey to provide expert testimony. He was asked to provide an opinion on the degree to which the CRT test is job-related and consistent with business necessity. Ex. 6, Hanvey Report, 1, ¶1; 3-4, ¶8. The bulk of Dr. Hanvey's work appears to have been devoted to assessing the physical demands of the driver job at Schuster. Not surprisingly, he observed that some physical strength is required to do the work of a driver, classifying it under CRT's "light-medium" strength category. Ex. 6, Hanvey Report, 1-2 ¶3. Dr. Hanvey has no opinion as to whether the cut score of 151 for a light-medium job is appropriate, because he does not know how the score is calculated or how the cut score was determined. Ex. 7, Hanvey Dep., 195:21-196:14. EEOC does not dispute that some tasks performed by Schuster truck drivers require some physical exertion (namely climbing into the cab)—but this simple fact is not validation evidence to support the use of any physical abilities test, let alone an isokinetic test where no one can explain how or why it works and is scored.

Dr. Hanvey also conducted a review of scientific literature on the use of physical abilities testing generally, including several types of testing not employed by Schuster. Ex. 6, Hanvey

2

Report, 28, ¶¶59-61. But his literature review concerning the use of isokinetic testing was limited as very little has been written on this topic. Indeed, he cites to only two "articles." One is just a one paragraph abstract and the other is an article from 1986 on team-lifting capacities in comparison to individual lifting capacities that makes no claims about workplace injuries or costs. Ex. 6, Hanvey Report, 28, n. 61.

Finally, Dr. Hanvey reviewed workers' compensation data from Schuster from the years 2011 to 2019. Ex. 6, Hanvey Report, 30, ¶66. Dr. Hanvey did not attempt a statistical analysis of the rate or costs of accidents over the years, purportedly because there were too few injuries at Schuster during this time period to allow for meaningful analysis. Ex. 7, Hanvey Dep. 133:18-135:13, 186:1-187:13, Ex. 6, Hanvey Report, 32, ¶71.

Despite having no knowledge of how the CRT test is scored (Ex. 7, Hanvey Dep., 54:19-55:4) or the cut score determined (Ex. 7, Hanvey Dep., 195:21-196:14), and not being able to say that there is any statistical relationship between Schuster's use of the test and reduction in worker's compensation injury costs, Dr. Hanvey opines that the CRT test is valid. He does not follow any reliable methodology in arriving at his opinions. Dr. Hanvey's testimony is unreliable and irrelevant, and should be excluded because it does not satisfy Rule 702 and *Daubert*.

## II.     Legal Standard

A court presented with expert testimony must exercise a gatekeeping function to determine if the testimony is relevant and reliable. *Daubert*, 509 U.S. at 592-93; *Anderson v. Raymond Corp.*, 340 F.3d 520, 523 (8th Cir. 2003). Federal Rule of Evidence 702 ("Rule 702") governs the admissibility of expert testimony. Under Rule 702, expert testimony is relevant if it will "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Expert testimony is reliable under Rule 702 if the testimony is "based upon

3

sufficient facts or data; the testimony is the product of reliable principles and methods; and the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(b)-(d). The proponent of the expert testimony must prove its admissibility by a preponderance of the evidence. *Daubert,* 509 U.S. at 592.

The Supreme Court's decision in *Daubert* identifies a number of factors courts may consider to determine if an expert's methodology is reliable, including: (1) whether the technique or scientific knowledge can be and has been tested; (2) whether the theory or technique has been subjected to peer review; (3) the known or potential rate of error; and (4) whether the technique or test is generally accepted within the scientific community. *Daubert*, 509 U.S. at 593-94. This list of factors is non-exhaustive, and courts have considerable discretion in determining whether expert testimony is reliable. *Kumho*, 526 U.S. at 151-52.

An expert's "conclusions and methodology are not entirely distinct from one another." *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997). To be admissible, an expert's opinion must be based on more than "subjective belief and unsupported speculation." *Daubert*, 509 U.S. at 590. When expert opinion "is connected to existing data only by the *ipse dixit* of the expert," a district court "may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146. *See also Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758 (8th Cir. 2006). "Expert testimony is inadmissible if it is speculative, unsupported by sufficient facts, or contrary to the facts of the case." *In re Wholesale Grocery Prods. Antitrust Litig.*, 946 F.3d 995, 1001 (8th Cir. 2019).

The Eighth Circuit has said that when the district court sits as the fact finder, as it does in a disparate impact case such as this one, there can be a relaxed application of *Daubert*. *David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1015 (8th Cir. 2012). But the Eighth Circuit is also

4

clear that district courts may rely only on admissible evidence at the summary judgment stage. *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011).

## III. Argument

### A. Dr. Hanvey's Opinion that the CRT Test Caused a Reduction in Workers' Compensation Costs Is Not Based on the Application of Reliable Principles or Methods.

Dr. Hanvey should not be permitted to testify as to his unsupported opinion that the CRT test caused a reduction in workers' compensation costs at Schuster. To attempt to establish criterion validity, Dr. Hanvey performed an analysis of Schuster's injury data. But this analysis should be excluded because Dr. Hanvey did not follow any reliable principles or methods. Fed. R. Evid. 702(c). Namely, although both the Uniform Guidelines on Employee Selection Procedures (UGESP) and the Principles for the Validation and Use of Personnel Selection Procedures of the American Psychological Association ("SIOP Principles") call for a statistical analysis to establish criterion validity, Dr. Hanvey performed no statistical analysis to show a relationship between Schuster's use of the CRT test and a reduction in injury costs and said any statistical analysis would not be appropriate. Instead, he created a simple bar graph that does nothing more than show injury costs over time. But the graph is flawed because it includes the cost of injuries that CRT does not claim its test could prevent and because it does not offer any comparison data, for example how the untested employee population fared over the same period of time, and the existence of any similar peaks and valleys in accident rates that the test does not claim to limit. Dr. Hanvey also does not even understand the costs he claims the CRT test reduced: admitting he does not know what is included within the workers' compensation costs he reviewed. And Dr. Hanvey's opinion that the CRT test caused a reduction in worker's compensation costs is unsupported by his non-statistical analysis.

5

### 1. Establishing Criterion Validity

Criterion validation is a scientific process of compiling empirical data to demonstrate that an employment practice, such as a test, predicts or is significantly correlated with successful performance of important aspects of a job. *See, e.g.*, 29 C.F.R. §§ 1607.5(B), 1607.16F, and 1607.14B (definition and discussion of criterion validity standards in UGESP). UGESP calls for a statistical analysis to establish criterion validity:

> The degree of relationship between selection procedure scores and criterion measures should be examined and computed, using professionally acceptable statistical procedures.

29 C.F.R. § 1607.14(B)(5). An employer attempting to validate a selection procedure through criterion validity must determine whether a criterion validity study is technically feasible, 29 C.F.R. § 1607.14(B)(1). "Technically feasible" is defined as having a sufficient sample size to achieve a finding of statistical significance, having a representative sample, and "having or being able to devise unbiased, reliable and relevant measures of job performance or other criteria of employee adequacy." 29 C.F.R. § 1607.16(U). If a criterion validity study is not technically feasible, another method of establishing validity must be used. 29 C.F.R. § 1607.14(B)(1).

The SIOP Principles, contain similar technical guidelines for criterion validity studies. The SIOP Principles advise that the feasibility of performing a criterion validity study must be determined:

> The availability of appropriate criterion measures, the availability and representativeness of the research sample, and the adequacy of statistical power are very important in determining the feasibility of conducting a criterion-related study. Depending on their magnitude, deficiencies in any of these considerations can significantly weaken a criterion-related validation study.

Ex. 1, SIOP Principles, 10. They also contemplate that a statistical analysis will be performed.

6

The quality of the validation study depends as much on the appropriateness of the data analysis as on the data collected during the research…The analysis should provide information about the effect sizes and the statistical significance associated with predictor-criterion relationships, along with standard errors or confident intervals for those relationships.

*Id.* at 13. With respect to the selected criterion measure, the SIOP Principles state that the criterion study should report in detail "a description of the criterion measures, the rationale for their use; the data collection procedures, and a discussion of the measures' relevance, reliability, possible deficiencies, possible sources of contamination and freedom from or control of biasing sources of variance." *Id.* at 32.

### 2. Dr. Hanvey Performed No Statistical Analysis as Required by UGESP and the SIOP Principles.

When an expert does not follow his own field's methodology, it is appropriate to exclude the expert's testimony. *Hoekman v. Education Minnesota*, 335 F.R.D. 219, 240-41 (D. Minn. 2020) (excluding an economist's opinion were the expert performed no statistical analysis, and whose conclusions were based on inferences from data sets for which he could provide no potential error rate). Dr. Hanvey recognizes that UGESP and the SIOP Principles are authoritative sources with respect to test validation. Hanvey Report, 7, ¶ 16. However, in performing his analysis of Schuster's injury data, Dr. Hanvey did not follow any of the requirements of UGESP or the SIOP Principles for conducting criterion studies, and in fact, did not perform a criterion validity study at all. Dr. Hanvey concluded that a statistical analysis of Schuster's injury data was not technically feasible. He thus rightfully admits that he cannot say that there is a "statistical relationship" between Schuster's use of the CRT test and changes in workers compensation costs over time. Ex. 7, Hanvey Dep., 170:18-172:8.

I can't conclude there's a statistical relationship: instead what I've done is simply present the data, and anyone who looks at it can—can reach their—their

7

conclusions. It appears to me to be a significant reduction, but I don't have a statistical analysis to say one way or the other…

Ex. 7, Hanvey Dep., 170:18-171:20.

Having done no statistical analysis, Dr. Hanvey has not met the requirements of UGESP or the SIOP Principles for establishing criterion validity by showing a statistically significant relationship between the CRT test and any changes in Schuster's workers compensation costs. Accordingly, his analysis of Schuster's injury data and his related opinions should be excluded. *See Hoekman*, 335 F.R.D. at 240-41. *See also Littler v. Ohio Association of Public Edu. Employees*, Case No. 2:18-cv-1745, 2020 WL 1861646, *6 (N.D. Ohio April 14, 2020) (excluding similar expert testimony as in *Hoekman*, in part because the expert did not perform a statistical analysis and his opinions were based on correlation and not causation).

### 3. Dr. Hanvey Assumes the CRT Test Prevents a Far Broader Range of Injuries than the Test Developer Claims the Test Can Prevent.

Dr. Hanvey's analysis of Schuster's injury data should also be excluded because he assumes a broader range of injuries could be prevented by the CRT test than CRT claims. Expert opinions should be excluded where they are based on flawed, unsupported assumptions. In *In re Wholesale Grocery Products Antitrust Litigation*, 946 F.3d 995, 1003 (8th Cir. 2019), the Eighth Circuit affirmed the exclusion of the plaintiffs' expert witness where the court found the expert's analysis of the alleged harm the plaintiffs, grocery retailers, experienced because of an agreement between two grocery wholesalers rested on the unfounded assumption that the plaintiffs' wholesale grocery costs would have followed the same pattern as another grocery retailer the expert used as a benchmark. *Id.* Similarly, in *Nebraska Plastics, Inc.v. Holland Colors Americas, Inc.*, 408 F.3d 410, 416-17 (8th Cir. 2005), the Eighth Circuit affirmed the

exclusion of the plaintiff's expert's testimony on future damages where the expert based his damages calculations on an assumption contrary to the facts of the case.

Instead of relying on CRT's description of the injuries it purports its test can prevent, Dr. Hanvey used the following definition from the Bureau of Labor Statistics (BLS):

> Musculoskeletal disorders (MSDs) include cases where the nature of the injury or illness is pinched nerve; herniated disc; meniscus tear; sprains, strains, tears; hernia (traumatic and nontraumatic); pain, swelling, and numbness; carpal or tarsal tunnel syndrome; Raynaud's syndrome or phenomenon; musculoskeletal system and connective tissue diseases or disorders, when the event or exposure leading to the injury or illness is overexertion and bodily reaction, unspecified; overexertion involving outside sources; repetitive motion involving microtasks; other and multiple exertions or bodily reactions; and rubbed/ abraded, or jarred by vibration.

Ex. 6, Hanvey Report, 30-31, ¶ 67. The BLS definition of MSD injury does not contain any causation limits. However, CRT admits that its test cannot prevent injuries caused by accidents, defined as "an event that happens by chance or that is without apparent or deliberate cause." Ex. 2, CRT Email (CRT000224-5). CRT also admits that its test cannot prevent injuries caused by striking or being struck by an object. Ex. 3, CRT Substantive Rule 30(b)(6) Dep., 48:10-18. The BLS definition also includes injuries to body parts that the CRT test does not test and injuries which CRT does not claim its test can prevent. CRT only claims its test can predict injuries to the tested joints—the shoulder, knee, or trunk—and does not represent that it can predict injuries to non-tested joints. Ex. 2, CRT Email (CRT000224-5). Despite these limits, CRT Dr. Hanvey codes injuries as relevant that CRT does not claim its test could have prevented. For example, he included a February 3, 2011, sprain to a driver's hand, even though the CRT test does not test hand strength. Ex. 6, Hanvey Report, Exhibit 6.

He also identified as relevant a January 17, 2013, injury in which an employee struck his back while getting out from under the trailer and herniated a disk. Ex. 6, Hanvey Report, Exhibit

9

6, "Classification of Driver's Inquires as Muscular Skeletal Disorder (MSD)". That injury cost $250,576.23. *Id.* Dr. Hanvey also coded as a relevant MSD injury a November 19, 2013, injury in which an employee dislocated his knee while showering, which at the time of Dr. Hanvey's report, cost $315,489.31. *Id.* That injury as well is not one that CRT claims its test could prevent. Ex. 3, CRT Substantive Rule 30(b)(6) Dep., 87:17-23. Those two injuries alone account for $566,065.54 of the $573,927 in injury costs that Dr. Hanvey included for 2013. Without including those two expensive, irrelevant injuries from 2013, Dr. Hanvey's Figure 1 would look far different, with the costs for 2013 totaling only $7,862 rather than $573,927.

Dr. Hanvey provides no basis for departing from the description of injuries that CRT claims its test can prevent and instead using the broader BLS definition. When asked at his deposition about coding the shower injury described above as relevant when CRT did not, and whether he would tend to trust the test developer to know whether an injury is one that the test is testing for, Dr. Hanvey responded, "To me, it was more important to do an independent analysis than just accept what the test vendor says." Ex. 7, Hanvey Dep. 185:21-23. But Dr. Hanvey has little knowledge about how the CRT test works, what it measures, or how it is scored. He has no expertise in physical medicine, physical therapy, or kinesiology. He has provided no basis for why his "independent" analysis of what a relevant MSD injury is should ignore CRT's view of the test's ability to prevent certain MSD injuries. Specifically, Dr. Hanvey has provided no basis for his opinion that the CRT test could prevent an employee from dislocating his knee while showering, herniating a disk while striking his back against a trailer, or straining his hand when CRT says they are not injuries the test could prevent.

10

### 4. Dr. Hanvey's Opinion that the CRT Test Reduced MSD Injury Costs Is Not Supported by His Own Analysis.

Even if Dr. Hanvey's methodology for analyzing Schuster's injury data were appropriate, his opinion that Schuster's use of the CRT test reduced workers' compensation costs attributable to MSD injuries does not follow from his analysis. District courts do not abuse their discretion when excluding expert testimony because the expert's conclusions do not follow from the existing data. While *Daubert* states that a trial court should focus on an expert's underlying principles and methodology, "conclusions and methodology are not entirely distinct from one another" and expert testimony can be excluded when there "is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146.

 Relying on "a visual inspection of graphic data," *i.e.,* Figure 1, Dr. Hanvey states in his report that "[t]he results of this analysis [of Schuster's injury data] showed an immediate and dramatic reduction in the costs associated with Muscular Skeletal Disorder (MSD) injuries." Ex. 6, Hanvey Report, 3, ¶ 5. Dr. Hanvey does not consider that most employees at Schuster during the initial years after the test was implemented did not take the test prior to hire, so the test could not have caused an immediate and dramatic reduction in injury costs when only a minority of employees were hired after passing the test. In 2014, only 15% of Schuster's employees were tested pre-hire. Ex. 16, Landis Decl. ¶12; Ex. 15, Landis Supplemental Report at 10. In 2015, only 37% of Schuster's employees were tested pre-hire. *Id.* Only 46% of Schuster's employees in 2016 were tested pre-hire. *Id.* And more recently, when a greater proportion of employees have been hired after passing the CRT test, injury costs are rising. According to Dr. Hanvey's own graph the injury costs in 2018 exceed the injury costs in 2011 and 2012, and the injury costs in 2019 exceed the injury costs in 2012 and nearly equal the injury costs in 2011. Ex. 6, Hanvey

11

Report, 32, figure 1. Similarly, the injury costs per mile in 2018 and 2019 exceed those in 2012. Ex. 6, Hanvey Report, 34, figure 2[1]. Costs in the more recent years are just as much or more than what they were before using the CRT test, with 2013 obviously being an outlier year. There simply is no pattern in the workers' compensation costs, and certainly no obvious—let alone statistically significant—reduction in costs over time that can be attributed to the CRT test.

Nothing about Dr. Hanvey's rudimentary analysis supports the conclusion that the CRT test caused a reduction in MSD injuries and costs. He did not compare the rate of injury of employees who were hired after passing the test and incumbent employees who were hired without taking the test. Nor did he compare the rate of injury of employees who passed the test and the incumbent employees who failed the test. He also did not compare the supposed decline in MSD injuries to any changes in non-MSD injuries over time at Schuster. Between 2014 and 2016, when Dr. Hanvey claims there were no MSD injuries, the number of the number of non-MSD injuries dropped, too, which cannot be because of the CRT test. Ex. 6, Hanvey Report, 2-3, ¶ 5; 32, ¶ 70; Ex. 17, Scherbaum Decl., ¶¶ 9-11; Ex. 8, Scherbaum Report at 33. And in more recent years, both non-MSD and MSD injuries are on the rise. Ex. 17, Scherbaum Decl., ¶¶ 6-7, 9-11; Ex. 8, Scherbaum Report at 28, and 33. If the CRT test had an impact on MSD injuries, however, one would expect that MSD injuries would drop more significantly than injuries

---

[1] Dr. Landis could not replicate the number of drivers in a given year that Dr. Hanvey used in calculating the per mile costs. Ex. 15, Landis Supp. Report, 3, ¶7. Dr. Hanvey did not disclose any data source for the figures he used, and certainly did not rely on the excel file Dr. Landis used in calculating his figures ("Driver List 2014 to Current.xlsx"). Ex. 16, Landis Decl., 2, ¶ 9. The delayed production of this file, and lack of disclosure by Dr. Hanvey of his alleged reliance on it, are subject to Defendant's Motion to Strike Expert Opinions. *See* Dkt. 55-10, 3-4. Nonetheless, EEOC accepts Dr. Hanvey's analysis on this issue as true for this motion.

overall. In fact, MSD injuries coded by Dr. Hanvey made up a greater portion of total injuries in 2019 than they did in any year before Schuster used the CRT test. *Id.*

Indeed, Dr. Hanvey admitted at his deposition that the bar graph he presents in Figure 1 does not establish that any reduction in workers' compensation costs at Schuster was due to the CRT test. When asked whether he could say to a reasonable degree of scientific certainty that changes in Schuster's workers compensation costs were due to the CRT test he said, "I will say that I believe, in light of all the information available, that that is true. This chart alone, I wouldn't—I wouldn't be comfortable concluding that based on this chart alone." Ex. 7, Hanvey Dep., 172:4-8. Accordingly, Dr. Hanvey's analysis of Schuster's injury data and opinion that the CRT test caused a reduction in workers' compensation costs at Schuster is unreliable and inadmissible under Rule 702 and *Daubert*.

**5. Dr. Hanvey's Analysis of Injury Data Is Not Appropriate Expert Testimony.**

Dr. Hanvey's analysis of Schuster's injury data should be excluded because it does not rely on his expertise as an industrial organizational psychologist. In *Chen-Oster v. Goldman, Sachs & Co.*, the court in a pay and promotion sex discrimination case excluded part of the report of one of defendant's experts as being unreliable. 114 F. Supp. 3d 110, 123-124 (S.D.N.Y. 2015). The expert had performed regression analyses, which the plaintiffs did not challenge, and matched pairs analyses where he examined pairs of male and female vice presidents who shared similar characteristics but whose compensation was different. *Id.* He then interviewed managers to try to determine the source of the difference. The purpose of the analyses was to show that there were factors that explain pay, other than gender, that were not captured in the employer's data and that could not be included in regression models. *Id.* The court found the matched pairs

analyses unreliable as a statistical analysis because there was no determination of statistical significance, the sample sizes were small, the selection of the pairs was subject to bias, and there was a danger of reporting bias by the managers interviewed. *Id.* at 124. The employer argued that the matched pairs analyses were not intended to be statistical analyses and were designed to be illustrative. In that case, the court found the analyses inadmissible because a witness either must have first-hand knowledge of the matters about which he testifies, or his testimony must be based on expertise that will help the trier of fact. *Id.* The expert had neither, as he did not rely on his expertise as a statistician to perform a statistical analysis, and he did not have first-hand knowledge of the employer's compensation information, so it was "inappropriate to present that evidence with the imprimatur of an expert witness." *Id.* at 124; *see also Chen-Oster v. Goldman, Sachs & Co.*, 325 F.R.D. 55, 69-70 (S.D.N.Y. 2018) (overruling objections to Magistrate Judge's decision to exclude the matched pairs analyses).

Dr. Hanvey's analysis of Schuster's injury data suffers from the same flaws that led to the exclusion of the matched pairs analyses in *Chen-Oster*. Dr. Hanvey admittedly did no statistical analysis. He classified injuries as MSD injuries according to a BLS definition (which is not his area of expertise and for which he offered no foundation as to why that is the relevant definition). Then he simply added up injury costs, which anyone could do, and made a bar graph, which he says anyone can interpret and draw their own conclusions from. Nothing about Dr. Hanvey's injury analysis relies on his expertise as an industrial organizational psychologist. And Dr. Hanvey has no personal knowledge of Schuster's workers' compensation injuries or data. Indeed, Dr. Hanvey does not even understand the costs that he claims the CRT test has reduced, admitting that he does not know what is included within the workers' compensation costs he reviewed and contends were impacted by the CRT test. Ex. 7, Hanvey Dep., 78:10-79:6, 133:18-

14

135:13, 186:1-187:13. Dr. Hanvey's injury analysis should therefore be excluded, as it is relies on neither expert nor personal knowledge.

**B. Dr. Hanvey's Opinion that the DCI Study Provides Transportability Evidence Does Not Adhere to the Principles in the Uniform Guidelines or SIOP.**

Dr. Hanvey also attempts to validate Schuster's use of the CRT test by relying on a study conducted by DCI Consulting ("DCI Study"). CRT hired DCI to conduct a criterion validity study of the CRT test to use as a promotional marketing tool. Ex. 3, CRT Substantive Rule 30(b)(6) Dep., 68:6-17. DCI used workers' compensation claim data from two trucking companies, Company A and Company B, to conduct its analysis; Schuster was Company B. Ex. 5, DCI Rule 30(b)(6) Dep., 20:6-9. DCI claims in the study that employees hired after implementation of the CRT test were less likely than those hired before implementation to sustain certain relevant injuries. Dr. Hanvey does not claim that the DCI Study shows a statistically significant reduction of injuries at Schuster. Instead, Dr. Hanvey ignores Schuster's own data in the DCI Study and opines that the data from Company A can be "transported" to provide criterion validity at Schuster. Ex. 6, Hanvey Report, 29-30, ¶¶ 64-65. This attempt must fail because the requirements for transporting criterion validity are not met.

Three requirements must be met to transport a criterion validity study from one employer to another: (1) clear demonstration that the original employer's use of the selection procedure is valid; (2) that the jobs require substantially the same major work behaviors, as shown by an appropriate job analysis at both the job where the validity study was conducted and the borrowing user's job to which it is being transported; and (3) evidence of fairness for each race, sex, and ethnic group represented in the borrowing user's relevant labor market . *See* 29 C.F.R. § 1607.7(B); *Lanning v. Se. Pa. Transp. Auth.*, 181 F.3d 478, 491 fn. 18 (3rd Cir. 1999) (district court's reliance on other employer's validation study misplaced where insufficient evidence

15

established UGESP's three requirements to transport validity). Similarly, the SIOP Principles require a careful review of the existing validation study to ensure that it is technically sound and to determine its relevance to the current situation. "At a broad level, comparability in terms of job content or job requirements, job context, and job applicant group (if feasible) should be considered when determining the appropriateness of transportability in a particular situation." Ex 1, SIOP Principles, 19. Dr. Hanvey recognizes UGESP's and the SIOP Principles' transportability requirements, but then makes no attempt to establish them. Ex. 6, Hanvey Report, 29, n. 62-63. Therefore, his opinion that the DCI study supports the validity of Schuster's use of the CRT test should be excluded.

### 1. Dr. Hanvey Cannot Say that the DCI Study Clearly Demonstrates that the Test is Valid at Company A.

With no further explanation, Dr. Hanvey says that the DCI study is "sound and thorough, applying sound data management and statistical techniques to reach conclusions." Ex. 6, Hanvey Report, 30, ¶ 65. Most of the DCI Study relates to analyses of injury rates between tested and non-tested drivers, with only one analysis related to injury costs, comparing the median costs of injuries of tested and non-tested employees. Ex. 4, DCI Study, 27, table 20. Dr. Hanvey testified that he did not believe the number of injuries was relevant to validity, as the CRT test was not intended to predict injuries, but rather to reduce injury costs. Ex. 7, Hanvey Dep. 183:11-184:5, 189:22-190:4, 198:14-19. Thus, Dr. Hanvey disagrees with the premise underlying the DCI Study that the CRT test's intended purpose is to reduce the number of injuries. Any opinion Dr. Hanvey has as to the DCI Study's soundness or providing a clear demonstration of validity with respect to Company A is unreliable.

### 2. Dr. Hanvey Does Not Know Whether the Positions at Company A and Schuster are Substantially the Same.

16

Dr. Hanvey cannot, establish the second requirement for transporting criterion validity: that the relevant jobs at the two employers "perform substantially the same major work behaviors, as shown by appropriate job analyses both on the job or group of jobs on which the validity study was performed and on the job for which the selection procedure is to be used[.]" 29 C.F.R. § 1607.7(B)(2). There is no job analysis for Company A in the record. Because a job analysis for both companies is required, this alone is decisive on the issue of transportability. *Id.*

Attempting to show the jobs are suitably similar, Dr. Hanvey points to a lone, conclusory statement in the DCI study that "[Schuster] operates in the same industry and performs similar work when compared to Company A." Ex. 6, Hanvey Report, 30, ¶ 65 and n. 66. However, DCI has no independent knowledge of, and Hanvey did not attempt to verify, whether the jobs at Company A and Schuster "perform the same major work behaviors." Ex. 7, Hanvey Dep. 122:10-20. DCI merely relied on a representation from CRT that the jobs are similar and thus that comparing the two companies was appropriate. Ex. 5, DCI Rule 30(b)(6) Dep., 41:23-43:2.[2] But the only data in the record comparing the driver jobs at Company A and Schuster is that they had *different* exertional classifications – "light" for Company A and "light-medium" for Schuster. Ex. 3, CRT Substantive Rule 30(b)(6) Dep., 74:21-75:15. DCI was unaware of this fact when it conducted the study. Ex. 5, DCI Rule 30(b)(6) Dep., 35:8-36:4. Dr. Hanvey's uncritical acceptance of a bare assertion that the jobs at Company A and Schuster were similar, with no job analysis proving that was true, and other evidence showing they were not, does not meet

---

[2] "What I can say to that is as external consultants, we -- we do what all external consultants do, which is we take the data information that's provided to us and analyze it to the best of our ability. So we were told that these are highly similar positions and that we could look at them together….That is the nature of being an external consultant."

UGESP's or the SIOP Principles' requirements of showing that the jobs were sufficiently similar, and renders Dr. Hanvey's opinion that the DCI study is transportable unreliable.

### 3.  There Is No Evidence of Fairness.

The third requirement for transporting criterion validity is "a study of test fairness for each race, sex, and ethnic group which constitutes a significant factor in the borrowing user's relevant labor market for the job or jobs in question." 29 C.F.R. § 1607.7(B)(3). Dr. Hanvey does not offer any opinion as to whether the DCI study establishes that the CRT test is fair as to any race, sex, and ethnic group represented in the trucking industry. Nor has Dr. Hanvey offered an opinion of test fairness related to Schuster's use of the CRT test. To the contrary, the only evidence related to fairness to protected groups in the record is Dr. George's report showing that Schuster's use of the CRT test has a substantial disparate impact on women. Ex. 7, George Report at 5, ¶19; Ex. 6, George Decl., ¶7. This is an additional reason that Dr. Hanvey's opinion on transportability is unsupported by the facts of the case and unreliable.

### C.  Dr. Hanvey's "Literature Review" Does Not Support His Opinion.

Dr. Hanvey admits that most of the publications he reviewed in his literature review merely provide background about physical abilities test generally, and do not speak to isokinetic tests specifically or whether Schuster's use of the CRT isokinetic test is valid. Ex. 7, Hanvey Dep. 109:22-113:15. And, in fact, of the two articles he cites (Ex. 6, Hanvey Report, 28, n. 61) that do relate to isokinetic testing, one does not discuss isokinetic testing in relation to injury reduction, despite Dr. Hanvey's claims to the contrary. Ex. 18, Isometric and isokinetic testing of lifting strength of males in teamwork, Karwowsi and Mital, Ergonomics, 1986. Col. 29 No. 7, 869-878 ("Additivity of static (isometric) and dynamic (isokinetic) strengths for teams of two and three males was evaluated. [] The above results, indicating that human isometric and isotonic

lifting strengths are not additive, suggest that the lifting capability of males in teamwork would be reduced as the number to team members increases."). The other is merely a one paragraph abstract, not a peer reviewed article:

**Injury Reduction in Truck Driver/Dockworkers Through Physical Capability New Hire Screening**

T. B. Gilliam and S. J. Lund, IPCS, Hudson, OH

The purpose of this study was to determine the effectiveness of a physical capability new hire evaluation on the incidence of injury and to determine differences in strength and physical characteristics between new hire applicants who were recommended (REC) versus not recommended (N-REC) for a truck driver/dockworker position. New hire (NH) data collected from 11/98 through 8/99 was compared to Historical (HI) data collected from 11/97 through 8/99. Both groups were matched on length of employment. For the NH group, 365 applicants underwent an isokinetic evaluation consisting of knee and shoulder flexion and extension. The raw data to include peak torque; right and left and agonist and antagonist ratio scores; and force curve normality rating were mathematically analyzed to generate a Department of Labor Dictionary of Occupational Title strength rating. The rating was matched against the job requirement (heavy) and recommendation for hire was based on a correct match. Of the 365 applicants, 276 were REC for hire and 89 were N-REC. The REC group weighed less (199 lbs. vs. 243 lbs., p<.05) but generated more absolute torque (581-ft. lbs. vs. 472-ft. lbs., p<.05) than the N-REC group. The body symmetry scores were significantly (p<.05) higher for the REC group. The incidence rate of overexertion injuries to the knees, shoulders and back decreased from 16.7 to 1.04 for the NH group REC in comparison to the HI group. Fitting the worker to the job through an isokinetic new hire screening will result in a substantial decrease in overexertion injuries.

Ex. 19, Gilliam and Lund Abstract. While the SIOP Principles recognize the possibility of establishing validity through existing research literature, to do so typically involves a conducting a meta-analysis of a set of validity studies. Ex. 1, SIOP Principles, 19-20. One abstract and one generic article regarding isokinetic testing is far from the type of meta-analysis that Dr. Hanvey would need to support Schuster's use of the CRT test.

### D. Dr. Hanvey's Opinion that the CRT Test Caused a Reduction in MSD Injury Costs Based on Cumulative Evidence Is Unreliable.

To the extent that Dr. Hanvey bases his opinion of the validity of the CRT test not on any one type of validity evidence but the evidence as a whole, his opinion is unreliable and should be excluded. UGESP does not contemplate establishing validity by a piecemeal approach, where none of the methods of content, criterion, or construct validity are satisfied. A chapter by Dr.

19

Tonowski[3] in Dr. Hanvey's own book notes "that a common pitfall is trying to save a local criterion-related validity study that fails to find validity evidence by arguing for generalized validity evidence from other sources." Ex. 20, Tonowski, R. (2015). Test validation pitfalls. In C. Hanvey & K. Sady[4] (Eds.) *Practitioner's Guide to Legal Issues in Organizations* at 74.

Neither UGESP nor the SIOP Principles allow for validation by compiling evidence that on their own do not permit any inference of validity, which is the only evidence Dr. Hanvey has. Dr. Hanvey cannot show how passing the test demonstrates that one can perform the physical tasks found in his job analysis when he does not know what the test measures or how it is scored. Further, UGESP and the SIOP Principles do not recognize a non-statistical, descriptive chart, a study from another company where there is no evidence of transportability, and a one paragraph abstract as evidence that can establish that a test is valid, either individually or collectively. Despite Dr. Hanvey's attempt to use steps from three types of validation without completing any one of them. Nor has EEOC found case law supporting such a piecemeal approach to validity.

IV.     **Conclusion**

Dr. Hanvey's overall conclusion that the CRT test is valid is unsupported and unreliable when he does not know what the test measures or how it measures it; how the test is scored; the basis for setting the passing scores; or have any statistical evidence showing a relationship between the test and reduction in injuries or workers' compensation costs. Accordingly, EEOC requests that the Court exclude Dr. Hanvey as an expert witness.

---

[3] At the time of this publication Dr. Tonowski was an industrial/organizational psychologist employed by EEOC. He has since retired.
[4] EEOC notes that Dr. Hanvey's co-editor of his book, Dr. Sady, authored the DCI study. Dr. Hanvey never disclosed this relationship.

20

Dated: January 26, 2021        Respectfully submitted,


*s/ Miles Shultz*_____
Miles Shultz
Trial Attorney

U.S. Equal Employment Opportunity Commission
230 S. Dearborn, Suite 2920
Chicago, Illinois 60604
(312) 872-9718
Miles.Shultz@EEOC.gov

21

## <u>CERTIFICATE OF SERVICE</u>

I, Miles Shultz, certify that on January 26, 2021, I filed the foregoing document via ECF

which will send notification of such filing via e-mail to all counsel of record:

<u>For Defendant Schuster</u>:
Douglas Phillips, phillips@klasslaw.com
Timothy Clausen, clausen@klasslaw.com

<u>*s/ Miles Shultz*</u>
Miles Shultz
Counsel for Plaintiff EEOC
