# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA

Equal Employment Opportunity Commission,)
                                        )
            Plaintiff,                  )
                                        )
        -vs-                            )Civil Action No.
                                        )5:19-CV-4063
Schuster CO,                            )
                                        )
            Defendant.                  )
                                        )

The remote deposition via videoconference of CHESTER HANVEY, called by the Plaintiff for examination, pursuant to Notice and pursuant to the Federal Rules of Civil Procedure for the United States District Court pertaining to the taking of depositions for the purpose of discovery, taken by KELLY ANN POTTS, CERTIFIED SHORTHAND REPORTER, License No. 084-003558, within and for the County of Cook and State of Illinois on the 14th day of October, 2020, at 11:03 a.m.

1    A P P E A R A N C E S:

2

3         EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, by
          MR. ETHAN COHEN  (via Zoom)
4         MR. MILES SHULTZ  (via Zoom)   - and -
          MS. ELIZABETH BANASZAK  (via Zoom)
5         230 South Dearborn Street, Suite 2920
          Chicago, Illinois  60604
6         (312) 869-8000
          ethan.cohan@eeoc.gov
7         miles.shultz@eeoc.gov
          elizabeth.banaszak@eeoc.gov
8
               Appeared on behalf of the
9              Plaintiff;

10

11        KLASS LAW FIRM, by
          MR. DOUGLAS L. PHILLIPS  (via Zoom)
12        Mayfair Center
          4280 Serseant Road, Suite 290
13        Sioux City, Iowa  51106
          (712) 252-1866 Ext. 230
14        phillips@klasslaw.com

15             Appeared on behalf of the
               Defendant.

16

17

18             *              *              *

19

20

21

22

23

24

1                 INDEX OF EXAMINATION

2

3                                    PAGE

4     CHESTER HANVEY

5

6  Examination (Via Zoom) by Mr. Cohen..........10

7

8

9

10

11                INDEX TO EXHIBITS

12

13  EXHIBIT                         PAGE

14

15  No. 1    Hanvey Report.....................13

16  No. 4/6  Excel Sheet.......................141

17

18

19  DOCUMENT REFERRED TO

20  NOT MARKED:  www.askthetrucker.com............194

21

22

23

24                 *       *       *

1          THE STENOGRAPHER:  We have a couple

2    things to mention prior to going on the record:

3    All parties are aware that the witness will be

4    sworn in remotely.

5                    Remote depositions are more

6    challenging.  We kindly ask all participants to

7    speak clearly and one at a time.

8                    Here begins the videoconference

9    deposition of Chester Hanvey in the matter of EEOC

10   versus Schuster.

11                   Beginning with the noticing

12   party, will counsel please introduce themselves,

13   state whom they represent, and stipulate to the

14   swearing in of the witness remotely?

15          MR. COHEN:  All right.  Ethan Cohen.

16   I represent the EEOC in this matter, and I do

17   stipulate.

18          MR. PHILLIPS:  Doug Phillips for

19   Schuster Company.  So stipulated.

20          THE STENOGRAPHER:  Would you raise

21   your right hand?

22                   (Whereupon, witness sworn.)

23          THE STENOGRAPHER:  The witness has

24   declared their testimony during this proceeding is

1  under penalty of perjury.  The parties have stated

2  their agreement on the record.

3              You may proceed.

4              MR. COHEN:  All right.  Dr. Hanvey,

5  once again, good morning.  I appreciate your taking

6  the time to chat which us today and your

7  willingness to do it remotely.

8              These are odd times, and the way

9  we conduct depositions these days is a little bit

10 different than the norm.  I know you've been

11 deposed a number of times before.

12             Have you ever participated in a

13 remote video deposition like this before?

14             THE WITNESS:  Not through Zoom.  I've

15 done something somewhat similar, but the court

16 reporter was in the room with me and counsel was

17 elsewhere.  But this is first Zoom.

18             MR. COHEN:  All right.  Well, it will

19 be fairly similar to that.  We're going to be

20 sharing exhibits mostly by reference to documents

21 that you already have or may have been provided

22 with this morning.

23             There might be times when we will

24 look at an exhibit together via a URL that I'll

1   post into the "Chat," and I'll ask you to take that

2   URL, open it up in a browser, and we can look at

3   that together.

4                   Dose that sound good?

5                   THE WITNESS:  Yes.

6                   MR. COHEN:  Okay.  Even though you've

7   given depositions before, I like to always go

8   through the -- the general dep rules just so that

9   we can keep them in our minds and, because of the

10  video format, it's even more important that -- that

11  we do this.

12                  Obviously, it's best if only one

13  of us is speaking at a time.  There might be times

14  when we're cross-talking a little bit, especially

15  because, on a video format, it might be hard to

16  tell when somebody has completed a sentence or what

17  have you; but as much as we can, we should try to

18  avoid talking over each other.  Okay?

19                  THE WITNESS:  Okay.

20                  MR. COHEN:  If I ever ask a question

21  that you haven't heard or don't understand, please

22  ask me to repeat or rephrase it, and I will try to

23  do that for you.

24                  If you give an answer to a

1  you would care to use.

2      A      Are you -- Are you talking about just

3  simply counting the injuries?

4      Q      Yeah, specifically the MSD injuries.

5      A      No.  That wasn't an analysis that we

6  did.

7      Q      Okay.

8      A      I mean, I'm sure we can go back and

9  figure that out, but that wasn't an analysis we

10 did.

11     Q      Okay.  And -- And could you tell me

12 the rate at which Schuster employees who did take

13 the CRT test have experienced MSD injuries?

14     A      Again, we didn't analyze just -- just

15 simply counting the injuries.  We looked at the

16 costs associated with them.

17     Q      Okay.  And -- Well, we'll leave that

18 alone for a little bit.

19                Can you tell me, if the CRT BIS

20 scores were intended to test for the physical

21 strength necessary to do the job rather than to

22 lower the rate of MSD injuries, what would it be

23 set at?

24     A      I -- I'm not sure how they set the

1  numbers for the -- the BIS score.  I don't think

2  it's intended for that purpose, so I don't even

3  know if they would be able to answer that question,

4  but I certainly can't.

5      Q      Okay.  Based on your understanding,

6  does the -- the BIS score test for strength that is

7  greater than the minimum strength needed to perform

8  all of the tasks that you showed in your analysis

9  as requiring physical strength?

10     A      I'm not 100 percent sure I understand,

11 but maybe I can share my understanding and,

12 hopefully --

13     Q      Sure.

14     A      -- that will answer your question.

15            My understanding is that it's --

16 it's intended to reflect the level at which the --

17 the individual is at a lower likelihood of being

18 injured by performing those tasks.

19     Q      Well, maybe elaborate on -- on that a

20 little bit.

21            So does a higher score mean less

22 likelihood of injury and a -- and a lower score

23 mean greater likelihood of -- of injury?

24     A      I would say -- I don't know if it's --

1   A  Well, the entire -- everything that's

2 in the report is all -- all goes to, you know, the

3 same conclusion of the validity of the test.

4   Q  Well, we've got the chart, Figure --

5 Figure 1 and 2, yeah.

6         Figure 1 and 2 show what you

7 purport to be a reduction in costs, right?

8   A  Yes, yeah.  Figure . . .  Yes,

9 correct.

10   Q  All right.  And you -- the reduction

11 in costs being shown are based on the amount of

12 money that was paid out to employees in workers'

13 compensation.  Is that correct?

14   A  Specifically for MSD injuries, yes.

15   Q  For MSD injuries.  Okay.

16         And who pays that money to the

17 employees?

18   A  I -- I don't know how the workers'

19 comp process works.

20   Q  Okay.  So you don't know if what

21 Schuster pays is purely a function of the cost of

22 the claims that are being paid out to its employees

23 or if there are other metrics that are involved as

24 well in determining what Schuster is going to have

1  to pay?

2      A     All I can say about -- I mean, the

3  data that we relied upon was what was in the -- the

4  workers' compensation file.  So beyond that, I

5  don't have an understanding of the -- you know, who

6  pays who and how that process works.

7      Q     Okay.  So if part of what determined

8  cost to Schuster was the number of accidents

9  independent of the cost of the accidents, is that

10 something you would want to know?

11     A     I'm sorry.  Can you repeat that?

12     Q     Sure.  If part of what determined the

13 cost of accidents to Schuster was the number of

14 accidents that occurred independent of the

15 individual costs of -- of each accident, is that --

16 is that something you would want to know about?

17     A     I mean, certainly, I think nobody

18 wants injuries, so fewer is better.  But I think

19 that the critical metric here is the cost of them.

20     Q     Well, I guess, my question is, do you

21 know that the critical metric to Schuster in the

22 money that it has to pay, its cost, is the amount

23 of money that the employee received through the

24 workers' compensation regime?

1  said that that was a task they had to do at least

2  occasionally, which -- which you indicate means

3  daily.

4                          Does that seem correct to you,

5  that 40 percent of Schuster employees are having to

6  release the fifth wheel pin on a daily basis?

7       A      Yeah.  I think that's possible.  I

8  mean, it doesn't specify whether they're using --

9  they're manually doing it or whether they're using

10  the automatic feature.

11       Q      Ah.

12       A      So I do think that a --

13       Q      I get it.

14       A      -- number of people felt --

15       Q      All right.

16       A      -- they were probably doing it daily.

17       Q      So 40 percent are doing it.  We don't

18  know that 40 percent are needing to exert 90 pounds

19  of force to do it.

20                          Is that fair to say?

21       A      That's -- That's correct, yes.

22       Q      Okay.  Let's flip now to Page 28 and

23  your literature review.

24                          So the literature review is part

1    of your method of validating the CRT test.

2                    Is that fair to say?

3        A        To a -- To a certain extent.  I mean,

4    some of this information is just kind of general

5    background information, which is -- which is

6    useful, and then some of it speaks more directly to

7    the affiliate at Schuster.

8        Q        Okay.  Can you tell me which of the

9    articles that you cite to here on Page 28 relate

10   specifically to circumstances at -- at Schuster, in

11   your opinion?

12       A        Well, none of them included Schuster

13   in the study.

14       Q        Right, no.  Understood.

15                    But you differentiate between

16   general and more applicable to Schuster.

17                    So which are the ones that you

18   view as more applicable to Schuster as opposed to

19   just background knowledge?

20       A        Sure.  So if I'm looking at -- like,

21   all the information in Paragraph 59, that's general

22   background.  The statement in Paragraph 60, "Tests

23   that assess an applicant's job-related physical

24   abilities are widely used in organizations," that's

1  not really specific to Schuster.  That's a general

2  background statement.

3                    There's been several published

4  studies documenting the validity for physical tests

5  or accomplishing job tasks.  I would say that's

6  useful to know, but alone that doesn't really tell

7  you much about whether this particular test is --

8  is valid in this circumstance.

9                    There's a large body of

10  literature showing that risks of injuries,

11  accidents, exhaustion can be substantial, so the --

12  One of the most-frequently used work-related

13  outcomes in this research is cost of injuries.

14                    So I think that's -- that's

15  relevant here, not necessarily demonstrating that

16  it occurred like Schuster, but demonstrating that

17  that's a legitimate outcome to use when you're

18  studying the effectiveness of the -- of the tool.

19                    Let's see.  " . . . tests of

20  muscular strength are among the types of physical

21  tests with the highest relationship to blue-collar

22  jobs and tests used to evaluate shoulder, arm, and

23  torso strength tend to have the highest validity."

24                    So that's getting a little bit

1   closer to the situation here.  You know, this is

2   a -- a physical test as opposed to like a

3   psychomotor test or something like that.

4                    And so, generally speaking,

5   across-the-board, those tend to have the highest

6   relationship to blue-collar jobs, and I would

7   imagine truck driving would fall into that

8   category.

9                    And then shoulder, arm, and torso

10  strength, which are exactly what CRT's testing,

11  tend to have the high validity.  So, again,

12  we're -- we're starting to get closer to kind of

13  the specifics.

14                   So given all that background, I

15  think there's -- there's kind of general acceptance

16  that these are -- you know, have validity, at least

17  in certain circumstances.  So I think that's --

18  that's useful background to know.

19                   So I guess I would say all of

20  the -- all of the citations at the bottom of

21  Page 28 probably largely fit into the -- the

22  background area, but a couple of them are talking

23  about things that are specific to what we have at

24  Schuster.

1          Q      Do Gilliam and Lund, in their 2000

2    article -- do they specifically discuss isokinetic

3    testing?

4          A      Gilliam and Lund -- Oh, in '61.  I

5    don't recall.  I don't remember.

6          Q      And do you recall if Karwowski and

7    Mital --

8                 MR. COHEN:  And that's

9    K-a-r-w-o-w-s-k-i and Mital, M-i-t-a-l.

10   BY MR. COHEN:

11         Q      -- [continuing] 1986, do they discuss

12   isokinetic testing in -- in particular?

13         A      I don't -- I don't recall.  I'm pretty

14   sure that they definitely talked about reduction of

15   workplace injuries.  I -- I don't remember.

16         Q      Okay.  Well, there's something that I

17   saw in the Baker and Gebhardt article from 2012

18   that I just wanted to ask you about it, and it was

19   on Page 281 of the article.

20                     They write, "The disadvantage of

21   basic ability tests is that they do not resemble

22   the job and, thus, lack face validity."

23                     What -- What does that mean that

24   they "lack face validity"?

1  dolly crank or what you call the landing gear

2  cranks are operated in the same way on the -- in

3  the two different fleets?

4      A      That does -- I mean, it doesn't

5  directly say that.  I mean, it's saying that

6  they're performing similar work, so presumably, if

7  they're similar . . .  But on that specific -- it

8  doesn't reference the landing gear or any other

9  specific tasks.

10      Q      All right.  So you don't have a way to

11 assess whether or not DCI was correct in saying

12 that the work is similar; you have to take them at

13 face value when they say it's similar.  They're

14 both trucking.  That's -- That's how they're

15 similar?

16      A      Correct.  I'm not able to verify

17 what -- that statement that they made.

18      Q      Okay.  And did you ever have an

19 opportunity to observe the work at Company A?

20      A      I don't know who Company A is, so no.

21      Q      Okay.  All right.

22                   What is a cut score?

23      A      Well, in the context of personnel

24 selection, it's the score at which applicants

1          A       -- been in a number of cases and

2     people will say all sorts of things, so I -- I

3     don't think it will surprise me, no matter what's

4     in there.  I don't know what that is, though.

5          Q       You're saying under oath that you

6     really cannot imagine the types of critiques that

7     will be in the EEOC's report?

8          A       I do not know what will be in the

9     report.

10         Q       But that's different than imaging what

11    will in the report, right?

12         A       I think we're splitting hairs.  I -- I

13    would imagine the EEOC is only going to hire an

14    expert if they say it's not valid, so I'm sure

15    they're going to say that.  Beyond that, I don't

16    know.

17         Q       Well, we can leave it alone.

18                 Are all of the workers'

19    compensation injuries in your study resolved under

20    the same state workers' compensation system?

21         A       I'm not sure what you mean by that.

22         Q       Well, when a worker brings a claim for

23    workers' compensation, which is what is involved in

24    the CRT test, that's what we're trying to limit,

1    right, the worker will have that workers'

2    compensation claim resolved under a particular

3    state's workers' compensation regime, right?

4        A    I don't know.

5        Q    Were any of the workers' compensation

6    costs that you cite in your analysis the result of

7    litigation?

8        A    I don't think that information was

9    included in the database.  I don't know.

10       Q    And do you know how many of the

11   individuals in your study had retained counsel?

12       A    I do not.

13       Q    Do you understand that that can affect

14   the amount of money that is paid out in a workers'

15   compensation claim?

16       A    I don't know one way or the other if

17   that's true.

18       Q    Did Schuster sue any third parties to

19   recover the costs of the workers' compensation

20   claim?

21       A    I don't have any information on that.

22       Q    Wouldn't that be important information

23   to have when you're assessing the cost of workers'

24   compensation injuries to Schuster?

1          A       Not necessarily.  I mean, there's --

2    there's, obviously, a lot of different ways you

3    could look at it.  I went with the data that was

4    available which I believe to represent the cost of

5    injuries.

6          Q       Did you ask Schuster if they'd

7    recovered any of their costs?

8          A       I did not.

9          Q       All right.  And you understand that if

10   Schuster were able to recover costs of a workers'

11   comp injury from a third party, it would indicate

12   that there was a third party that was at least

13   partially responsible for that injury, right?

14         A       I don't know that that's always true.

15   I'm not sure.

16         Q       I've got a question without a page

17   number, but you might recognize it or we might be

18   get there fairly quickly.

19                   You talk about overexertion and

20   bodily reaction.

21                   Do you recall the --

22         A       You may be referring to the -- the

23   definition that the Bureau of Labor Statistics

24   provides for MSD injuries.  Is that correct?

1      A      I don't think it would predict

2  striking backs, no.

3      Q      Okay.  But this was coded as an MSD

4  injury, and it added $250,000 to the cost of not

5  performing the CRT test.

6              Is that fair to say?

7      A      Correct.  The -- The reason that one

8  was coded was because it's a herniated disc, which

9  is specifically identified as an MSD injury,

10  according to the Bureau of Labor Statistics.

11      Q      So it's an MSD injury, but it's not

12  something that you would expect the CRT test to

13  predict just as you wouldn't expect the CRT test to

14  predict a freak accident, right?

15      A      I don't -- I don't know.  I don't know

16  if CRT would say that that would be predictable or

17  not.  I don't know.  I'd be speculating.

18      Q      Okay.  Well, you've talked a lot about

19  you have to speculate or you're assuming or

20  you're -- you're just thinking something sounds

21  reasonable.

22              If we look at your two charts,

23  chart -- Figure 1 and Figure 2, "Cost of MSD

24  Injuries by Year" and "Cost of MSD Injuries Per

1    Mile Driven by Year," can you say to a reasonable

2    degree of scientific certainty that changes in the

3    costs over time are attributable to the CRT test?

4         A     Can you -- Can you repeat that?

5         Q     Can you say with a reasonable degree

6    of scientific certainty that changes in the costs

7    shown over time are due to the CRT test?

8         A     So what I can say is -- is this:  I

9    did not run a statistical test, as I -- as I

10   described in the report based on the nature of the

11   data.

12                   So I would say short of that, I

13   can't conclude with -- that there's a statistical

14   relationship.  Instead what I've done is simply

15   present the data, and anyone who looks at it can --

16   can reach their -- their conclusions.

17                   It appears to me to be a

18   significant reduction, but I don't have a

19   statistical analysis to say one way or the other

20   whether that's --

21        Q     Well, I assume that -- that I/O

22   psychologists have tools in addition to statistics,

23   so I'll put the question to you again.

24                   Can you say to a reasonable

1    degree of scientific certainty that changes in

2    costs per year at Schuster are due to the

3    implementation of the CRT test?

4         A     I will say that I believe, in light of

5    all the information available, that that is true.

6    This chart alone, I wouldn't -- I wouldn't be

7    comfortable concluding that based on this chart

8    alone.

9         Q     Okay.  But, again, let's just separate

10   out my question now, which is different from the

11   chart.

12                   Can you say to a reasonable

13   degree of scientific certainty that the change in

14   workers' comp costs at Schuster over time are due

15   to the implementation of the CRT test?

16        A     I believe that they are, yes.

17        Q     Okay.  And would it be fair to say,

18   then, that the increase in costs in 2018 and 2019

19   that are higher than the costs in 2012 are due to

20   the use of the CRT test?  Did the CRT test make

21   costs go up above what was found in 2012?

22        A     I don't think so, no.

23        Q     Why not?

24        A     I can't think of any logical reasoning

1    three in 2013, none in '15 or '16, but you have six

2    injuries in 2019, right?

3           A       That's -- Yeah.  That's what the data

4    show.

5           Q       All right.  So some years are more,

6    some years that are less.

7                         Is that attributable to the CRT

8    test?

9           A       I'm not sure what you mean,

10   "attributable."

11          Q       Well, is the fact that there are

12   different numbers of MSD injuries year-to-year in

13   any way attributable to the CRT test?

14          A       I'm not totally sure I -- so the --

15   This isn't really the -- the metric that I think is

16   appropriate here, so I don't really know.

17                         I would guess that the

18   implementation of the test probably had an effect

19   in lowering that, but the count of total injuries

20   isn't really what we're -- what we're talking

21   about, so I'm not really sure.

22          Q       Why do you believe that?

23          A       Well, if you're looking at -- If

24   you're simply counting the injuries, there's a

1  critical assumption that all injuries are

2  equivalent, and I don't think that's -- that's the

3  case.  You can see from the -- the pretty wide

4  variety of costs that there's large differences in

5  the impact to some of these injuries.

6      Q      Well, what leads to the differences in

7  costs?

8      A      Well, I'm -- I would assume it's

9  related to severity of the injury, but I'm sure

10 there's -- there's a variety of factors.

11     Q      Does the CRT test necessarily predict

12 the severity of an injury?

13     A      I think that they have always

14 maintained that their -- the expected outcome is to

15 reduce costs associated with injuries, so I guess

16 indirectly, yes.

17     Q      Does it concern you at all that --

18 that neither DCI nor CRT believed that the -- the

19 fall in the shower is something that would have

20 been predicted by the CRT test?

21     A      I did a review of what -- how we coded

22 and what DCI coded and what CRT coded.  By and

23 large, we -- we agreed.  I think it was 80 percent

24 agreement between -- between the two of us.

1    So I think that's -- that's
2  pretty good for this type of rating exercise.  You
3  know, the fact that there are a couple differences
4  doesn't really bother me.  I think that's part
5  of -- kind of part of the reason you have somebody
6  else look at it.
7    And our results and DCI's results
8  are all pointing the same direction, so it seems to
9  suggest that those -- those small differences in
10  the coding don't really have much of an impact.
11    Q    Well, that one injury has a very big
12  impact.  That's $315,000 worth of impact right
13  there, right?
14    A    Which injury are you referring to?
15    Q    The shower injury.
16    A    Yeah.  That did that have amount
17  impact, correct.
18    Q    Okay.  And wouldn't you tend to trust
19  the developer of the test to know whether or not an
20  injury is an injury that their test is testing for?
21    A    To me, it was more important to do an
22  independent analysis than just accept what the test
23  vendor says.
24    Q    Okay.  Okay.

1                    And you don't know a lot about
2    workers' comp and how that might affect the costs,
3    right?
4        A       How what might affect the costs?
5        Q       Workers' compensation as a system for
6    assignment costs.
7        A       Correct.  I don't have any experience
8    in the workers' compensation system.
9        Q       Okay.  So you're relying on workers'
10   compensation costs as the most significant metric,
11   but it's a metric you really don't know much about?
12       A       I know what the dollars and cents say,
13   so, to me, it's . . .
14       Q       But you don't -- you don't know -- But
15   you're assuming, again, that more dollars means
16   more serious injury as opposed to, there was a
17   lawyer involved or it was just, you know, a freak,
18   right?  You're trying to exclude the freak
19   accidents.
20                    You don't know what went into
21   creating the -- the costs associated with these
22   individual claims, do you?
23       A       I don't think I made the assumption
24   that you said, but you're correct that I don't know

1   the details of what went into the claims.

2        Q     Do you know whether or not any of the

3   workers' comp claims that you analyzed are still

4   open?

5        A     I don't.  All -- All I -- As I said, I

6   have the data that were provided to me, and I

7   analyzed that data.

8        Q     So the costs to Schuster could still

9   be going up despite the implementation of the CRT

10   test, right?

11        A     I suppose it's possible.  I don't -- I

12   don't know how that system works, so . . .  I don't

13   have any reason to think that's incorrect.

14        Q     Okay.  Days off work is a metric that

15   might concern employers as it would concern

16   Schuster.  Would you agree?

17        A     I don't know if it concerns Schuster

18   or not.  I can say that I know that in other

19   contexts, that is an outcome that other -- other

20   validation studies have -- have looked at.

21        Q     Are you aware that there's a national

22   shortage of drivers, truck drivers, in the

23   United States?

24        A     I've heard reference to it, yes.

1      A      I suppose.  I -- I don't know if I can

2  ascribe personality traits to an organization, but

3  if you'd like --

4      Q      Well, there are corporate -- There are

5  corporate cultures, right, and mission statements

6  and things like that.

7                    I would assume that Schuster is

8  typically telling its employees that it cares about

9  their safety.

10                   Do you believe that Schuster

11 cares about their safety?

12     A      Yeah.  The folks that I spoke to said

13 that safety is definitely a -- something that --

14 that Schuster takes very seriously.

15     Q      So I would expect that Schuster

16 generally would hope that its employees would have

17 fewer accidents overall and not just cheaper

18 accidents?

19     A      I would assume they would like zero

20 accidents, but yes.

21     Q      Okay.  All right.

22                   And, yet, you don't believe that

23 accidents by year is relevant to the validity of

24 the CRT test.  Is that true?

1          A        That's not -- To my knowledge, that

2     was never something that the CRT test was intended

3     to predict.  It was -- Everything I've ever seen

4     has always been related to the costs.

5          Q        Okay.  So Schuster is engaging every

6     year in trying to improve safety and improve its

7     equipment, correct?

8          A        That's what I was told, yes.

9          Q        And . . .  But you don't believe that

10    that would have had a cumulative effect on

11    accidents over time?

12         A        I -- I didn't say that, no.

13         Q        Okay.  So it's possible -- Well, how

14    much of the effect that you see here in your chart

15    number -- in your Figure No. 1 and your Figure

16    No. 2 is attributable to the CRT test?

17         A        I don't think there's any possible way

18    to put a number on that.

19         Q        Okay.  And that's because you can't do

20    a statistical analysis of these injuries, correct?

21         A        It's just sort of inherently

22    unknowable.  It's -- There's no way you could even

23    do that.

24         Q        Well, don't -- don't statisticians,

1   identical, but, generally speaking, job relatedness

2   is demonstrated through validity evidence, so -- so

3   yes.

4         Q      Okay.  And does your purport -- I'm

5   sorry -- your report claim to show that it's --

6   that the CRT test is consistent with business

7   necessity, at least as utilized at Schuster?

8         A      Yes.

9         Q      It does make that claim?

10        A      I don't use that words, but the

11  validation evidence, I think, is related to that.

12        Q      Okay.  How so?

13        A      Well, in the context of physical

14  abilities, the business necessity often is related

15  to the -- the appropriate cut score, and so one of

16  the key pieces of the job analysis was to determine

17  whether the job fit into the right strength

18  category which, in turn, led to the cut score.  So

19  I think it does speak to the appropriateness of

20  that job classification.

21        Q      How do you know that the cut score

22  does, in fact, fit the appropriate DOL job

23  category?  I think that's what you're referring to,

24  right, the heavy-medium, light-medium, what have

1  you?

2       A       Yeah.  So the -- That was developed by

3  CRT.  I do not know how they developed that, but --

4  I do not have access to that information.  So what

5  I've done is determine whether the job at Schuster

6  fits into the appropriate classification.  Beyond

7  that, I -- I don't have an opinion.

8       Q       Okay.  So you don't have an opinion as

9  to whether or not the cut score developed by CRT

10  is, in fact, appropriate.  You just know that

11  they're saying that it's the appropriate one for a

12  light-medium job, and you believe this to be a

13  light-medium job.  Is that correct?

14      A       That's correct.

15      Q       Okay.  Are there any other ways in

16  which you believe that the CRT test is consistent

17  with business necessity at Schuster?

18      A       I'm not -- maybe I'm not -- Nothing

19  that I can think of, although I don't know that I

20  have a great understanding of -- of the legal

21  interpretation of that beyond the cut score.

22      Q       Okay.  And, really, I was just wanting

23  to make sure I was understanding what you believe

24  your report establishes.

1        (Whereupon, a brief recess

2        was had.)

3        MR. COHEN:  We can restart.  Is

4   everybody ready?

5        THE WITNESS:  Yes.

6   BY MR. COHEN:

7      Q     And I do have a bit more, but,

8   hopefully, not a ton.  I don't think it's a ton.

9        Thinking about your Figure 1

10  that shows the costs to Schuster over time, you

11  attribute the dramatic drop from 2013 to 2014 to

12  the CRT test, right?

13     A     Yes.

14     Q     All right.  Why would you believe that

15  the CRT test would ever bring the cost of injuries

16  to zero?

17     A     Well, I think that's what the CRT test

18  is specifically designed to do, to reduce the cost

19  of injuries.

20     Q     Do you think that the CRT purveyors

21  would ever claim that it could bring an employer's

22  costs to zero?

23     A     I doubt they would make that claim,

24  no.