would be the same whether or not the test existed previously; but recall that *M.O.C.H.A.* (2012) addressed a situation where it was reasonable to conclude that job content did not vary across situations. Very little is said in UGESP (§ 7B) about transportability. First, there has to be validity to transport, coming from criterion validity studies that met UGESP prescriptions (§ 14B). Second, the original and new jobs must have "substantially the same major work behaviors." Third, there needs to be a fairness study if that were feasible.[26] A fourth concern in Q&A 66 is proper account of variables that could affect the applicability of the validity evidence to the new situation. Q&A 43 mentions, besides differences in work behaviors, differences in criterion measures and study samples.

"Substantially the same" is the issue. Johnson and Jolly's (2000) review of the professional literature and court decisions found little useful guidance. Presumably, there have to be at least two comparable job analyses that identify the same job behaviors. There can be a situation where the two jobs have only some behaviors in common (for example, lifting 50-lb. boxes) and the test is targeted only at those behaviors; the dissimilar behaviors are irrelevant because there is no test for them. The Principles (p. 27) phrase the matter as "job comparability in terms of content or requirements," with possibly the need to consider other factors such as "similarity of job context and candidate group." The inference based on both sources is that the transportability argument should show the similarity between jobs and anticipate factors that could undercut the effective use of the test in the new situation. Gibson and Caplinger (2007) have a discussion of transportability issues, but the key issue of how much similarity between jobs is not resolved.

[26] Statistical fairness has not been much of a practical concern. See, for example, Stark et al. (2004). In many situations, a study will not be feasible because there will not be enough subjects in different applicant groups. For cognitive tests, the research record indicates that fairness defined as lack of predictive bias is generally not an issue, but see the discussion on differential validity above for other tests.

### 3.10.2 Meta-Analytic Evidence

There was a time when conventional wisdom held that selection mechanisms depended on unknown (and unknowable) factors causing "situational specificity" of test validity. By the time that UGESP was published in 1978, science had moved on. Space, and likely the reader's level of interest, does not allow for a full discussion here of validity generalization (VG) theory and its implications, nor of criticism of its application (Biddle and Nooran 2006). Suffice it to say that staring in the 1970s, research has accumulated to show that a lot of situational specificity in criterion validation studies for cognitive tests is explained by mere statistical artifact. (Consult the current research literature for other kinds of tests.) Cumulative research indicates that cognitive ability is necessary to some degree for virtually any job, becoming more important with increased complexity of the job.

The tool for the research is called meta-analysis, a generic term that covers variations of statistical methodology for combining results across different studies to produce an overall statistical finding. The Principles (p. 28) states that meta-analysis can answer the question "whether valid inferences about work behavior or job performance can be drawn from predictor scores across given jobs or job families in different settings." Because the method is statistical, it works only with criterion validity results. Meta-analytic evidence for generalization of validity is frequently called just validity generalization, or VG. Meta-analysis is used in many fields; the effort to account for statistical artifacts responsible for variation in observed predictor–criterion correlations, and thus rule out moderator variables, is characteristic of its use in testing. Unlike UGESP, the Standards and Principles give coverage to VG.

One change in professional thinking about criterion validity studies over the years is that, unless a single validation study is well designed and has a large number of subjects, a more accurate estimation of the test's validity will come from a statistical combination of results from several studies. The rub is that the consideration of several studies brings with it questions of the

underlying similarity of those studies, and how dissimilarity might affect conclusions regarding generalization.

Theory, widely but not unanimously accepted, posits that underlying specific cognitive abilities (verbal, arithmetic, spatial relationships, deductive reasoning, etc.) is general cognitive ability (*g*), which can be loosely defined as the ability to learn.[27] It is *g* that facilitates the acquisition of job knowledge in formal or informal learning situations, and that knowledge drives job performance. This theory points up the universal importance of cognitive ability while downplaying specific job behavior content.

What might be called the "VG Heavy" conclusion is that if just about every job required cognitive ability, and the validity of cognitive tests generalized across jobs, then any reasonable test of cognitive ability would likely to be valid for whatever job it was used to select for.[28] Backing for other constructs may not be as strong. The Principles (pp. 28–30) is cautious about meta-analytic results in general: how the work and jobs were categorized for meta-analysis, the selection procedures and criterion measures in the studies included in the meta-analysis, and the meta-analysis methodology are relevant considerations in applying the conclusions of a meta-analysis. If the meta-analysis included only entry-level jobs and the job under consideration is managerial, the generalization conclusions may not hold. A "VG Lite" approach would aggregate studies using the same constructs, and preferably the same measures for predictor and criterion, across similar jobs, with an established absence of substantive factors known or suspected to influence generalization.

The legal burden for the generalized validity user includes showing that the test in question is job related for the situation in question. The test must not be the sort of "general ability tests" found to be inadequate in *Griggs* (1971) and *Albemarle* (1975).[29] This means making a distinction between tests which are valid for a specific purpose across a multiplicity of specific jobs and "broad and general testing devices" that "generally would improve the overall quality of the workforce" (*Griggs* 1971).

### 3.10.3 Synthetic Validity

A third validation approach that seems to have been poised for a breakthrough for decades is synthetic validity. Its time may have come. This approach is based on the idea that there are constructs that are well established to underlie particular important job behaviors. In turn, there are well-established tests for those constructs. A test for the entire job can be "synthesized" by putting together the tests that are appropriate for the set of job behaviors, and an overall validity for the resulting test can be calculated from the validities of test parts. One appeal of this method over VG Heavy is that specific job behaviors are taken into account.

What UGESP calls construct validity does not correspond to how psychologists have used the term, in 1978 or currently. One might wonder why anyone would undertake UGESP construct validity as a strategy, since it has to be built on criterion and content validity. But UGESP construct validity hints at strategies for using tests outside the contexts in which they were originally developed on the basis of already-existing validation information. It allows for generaliza-

[27] Schmidt and Hunter (2004) were leading supporters of the current theory for *g* in the workplace. See Dalliard (2013) for a technical but somewhat readable blog essay putting *g* in broader context and criticizing its critics. This is not a scientific, peer-reviewed piece, but it outlines the issues, introduces some of the key players, and has references to the academic literature for further reading. McDaniel and Banks (2010) have a brief overview of theory, and they discuss testing and legal issues. The chapter criticizes the enforcement agencies for failing to follow what VG research has shown.

[28] This is reinforced by another phenomenon, "positive manifold," described below.

[29] What appears to have been meant by general ability tests can be distinguished from what tests of general cognitive ability purport to do, despite the similarity in wording and the fact that the same tests may figure in both categories. Remember that the issue in test validity is how the test is used.

tion beyond the narrow confines of transportability (Q&A 81[30]). UGESP's construct validity may be synthetic validity (Trattner 1979). Synthetic validity is recognized in the Standards and Principles, but little guidance is provided. Johnson et al. (2010) have a focal article with several related discussion pieces that explore the recent state of the art.

A possibly emerging variation on synthetic validity may be skills certification tests. These tests run on a criterion-referenced testing (CRT) model. Despite the name, validity evidence likely comes from content strategy. The criterion here is the level of mastery of a given construct. This type of test is more associated with education than employment. But a possible employment application would be to perform a job analysis of a specific job to determine the relevance of the construct and the highest level necessary for job behaviors. A construct-specific but employer-generic test would assess for mastery at that level. Tests for other constructs would be administered in a similar way. This approach would imply pass/fail (mastery or no mastery) scoring.

Pitfalls include:

Validity may generalize, but EEO investigations tend to be situation-specific. That is because the investigation must consider all aspects of how the test is used. That includes aspects that may have more relevance to disparate treatment than the quality of the test. Giving the test to some people and not to others, or administering the test to some people in an air-conditioned room and to others in a room so hot that people are gasping does not reflect on test quality. But a claim that the test has generalized validity is not going to stop the investigation.

These are deliberate discriminatory acts. The less obvious problems will come from construct contamination and deficiency. Test content that is beyond the level of the job or test instructions pitched at a level higher than appropriate for job applicants can feed adverse impact, and possibly also either negate validity or set up an argument for an alternative test.[31] A test that does a good job tapping the intended construct but having adverse impact will come under fire if that construct applies only to a relatively minor aspect of the job but is the major determinant in the employment decision.

The proposed generalization argument is weak. UGESP does not state that local validation studies are required, although some writers think this is at least implicit. A more sure statement is that the enforcement agencies want to see evidence of validation that applies to the local situation, whatever that evidence is. An argument that the test taps cognitive ability and cognitive ability is relevant to virtually every job—and nothing more—is not going to deter EEO enforcement agencies or private plaintiffs. What looks like an argument about competency in some abstract sense triggers recollections of *Griggs* and *Albemarle*. What gets more traction is a discussion of how previous validation work applies to the job in question.

Case law on VG is meager and mixed. There will be other cases. The advice from Cascio and Aguinis (2005, pp. 221–222) for producing a winning case still holds: Provide evidence that the jobs currently under consideration are similar to those in the meta-analytic studies cited, show that the behaviors in the previous research (predictor and criterion) are relevant to the current situation, be sure that the primary studies cited are inclusive (no cherry-picking of studies or neglect of unpublished studies), the issue of potential moderator variables is addressed and the VG argument still stands, and there is detail on the primary studies so that the claims of generalization can be confirmed. Additionally, it might be useful to discuss primary study and transportabil-

[30] Q&A 81 seems to envision tests that pertain to the job as a whole, where construct validity is necessary because all job behaviors between two jobs are not the same. But as discussed previously, a test could reference only a common behavioral subset of the job domains, which makes for a transportability situation.

[31] Sackett (2012) illustrated that a verbal ability test pitched at a higher level than the job could still be valid. But there would need to be criterion evidence of this, and the degree of disparate impact and validity compared to a test more in line with the level required by the job is another matter.

ity evidence and then cap the argument with the VG evidence; it shows the informed but nonexpert reader that VG is not something pulled out of the air.

VG does not make right a local validation or transportability study gone wrong. If the validation argument with more conventional evidence does not hold together, capping the argument with VG will not save it. For example, after a local validation study conducted by an external consultant was severely criticized for not actually demonstrating validity, the employer brought in a new consultant to do a rebuttal. After passing lightly over the identified defects, the consultant claimed that none of this mattered anyway, since VG could be relied on. But lack of demonstrated validity in the local study could be used to undercut the VG argument, and there was the additional issue of why the local validation study had initially been relied on if it did not matter.

Test validity does not generalize simply because the test publisher says it does. EEOC does not grant a seal of approval to any test. To the extent that a test publisher claims that the test meets EEOC requirements, at most the publisher believes that the test is in compliance with UGESP. UGESP does not have a problem with a commercially available test; the problem is with the employer who has adverse impact and cannot show how the publisher's claim to validity applies to how the test is used in the current situation. See Q&A 35, which references UGESP § 7 A and Q&As 43 and 66.

Content makes a difference (at least sometimes). An area to watch concerns how much content matching between test and job is necessary to ensure validity. For test batteries, it may be that such matching is a sufficient, but not necessary, condition. If so, batteries would likely generalize across different job content; this would make transportability easier. Murphy et al. (2009) have explored "positive manifold," a phenomenon where there is a universe of tests that all correlate with each other and with a set of criteria.

Positive manifold applies to test batteries, not individual tests. It seems to apply well to assessments of cognitive ability (which may already have commonality because of *g*), but perhaps not so well to other areas such as personality traits. And if the assessment is for a specific knowledge content (e.g., accounting), substitution of some other content (e.g., American history) likely is not a good idea.

It probably would not be a good argument that mathematics (or whatever) tests could be substituted for other cognitive tests because, after all, cognitive measures tend to be correlated. For example, OFCCP got a hefty settlement from a federal contractor on an allegedly discriminatory test. Part of the complaint was that mathematics was on the test, but not on the job.

## 3.11 Miscellaneous Pitfalls

Time marches on. Validity does not go sour over time, but jobs change. Constructs once very important can be less so. New methods of doing old things can cause major chunks of job behavior to change, with consequences for both content and criterion evidence. In particular, employers should not assume that a test with notable adverse impact but good validity evidence is forever safe. If the job changes or viable alternative tests become available, there will be a problem. An example is two related actions concerning selection to an apprenticeship program that ultimately settled with an agreement for a new test (*EEOC v. Ford* 2004 *and* 2007). The old test had been validated and had been in use, with adverse impact, for years when EEOC came a-calling. Some literature, and OFCCP practice, indicate that a validity check should be done to see if further action is required if the test is being used when 5 years have elapsed since it was developed or last checked.

Uneven information across jobs arouses suspicion. If the test is intended to cover multiple jobs but information provided about some jobs is omitted for others, it is a signal that something is wrong with the validation documentation. Perhaps the omission was innocent oversight, or there was a clerical omission, or something that should have been done was not, or something was done that now is being hidden. Investigators