EXHIBIT PP

Chester Hanvey
Kayo Sady *Editors*

# Practitioner's Guide to Legal Issues in Organizations

Springer

# Practitioner's Guide to Legal Issues in Organizations

Chester Hanvey • Kayo Sady
Editors

# Practitioner's Guide to Legal Issues in Organizations

Springer

*Editors*
Chester Hanvey
Berkeley Research Group
San Diego
California
USA

Kayo Sady
DCI Consulting Group
Washington
District of Columbia
USA

ISBN 978-3-319-11142-1 ISBN 978-3-319-11143-8 (eBook)
DOI 10.1007/978-3-319-11143-8

Library of Congress Control Number: 2015936050

Springer Cham Heidelberg New York Dordrecht London
© Springer International Publishing Switzerland 2015
This work is subject to copyright. All rights are reserved by the Publisher, whether the whole or part of the material is concerned, specifically the rights of translation, reprinting, reuse of illustrations, recitation, broadcasting, reproduction on microfilms or in any other physical way, and transmission or information storage and retrieval, electronic adaptation, computer software, or by similar or dissimilar methodology now known or hereafter developed.
The use of general descriptive names, registered names, trademarks, service marks, etc. in this publication does not imply, even in the absence of a specific statement, that such names are exempt from the relevant protective laws and regulations and therefore free for general use.
The publisher, the authors and the editors are safe to assume that the advice and information in this book are believed to be true and accurate at the date of publication. Neither the publisher nor the authors or the editors give a warranty, express or implied, with respect to the material contained herein or for any errors or omissions that may have been made.

Printed on acid-free paper

Springer is part of Springer Science+Business Media (www.springer.com)

# Measuring Adverse Impact in Employee Selection Decisions

1

Eric Dunleavy, Scott Morris and Elizabeth Howard

## CONTENTS

1.1 Context and Background ........ 2
1.2 Structuring an EEO Analysis: The 2 by 2 Table ........ 4
1.3 Statistical Significance Testing in the EEO Context ........ 6
1.3.1 Understanding Error Rates ........ 7
1.3.2 One- or Two-Tailed Tests? ........ 8
1.3.3 Different Statistical Significance Tests ........ 8
1.3.4 The Multiple Comparisons Problem ........ 12
1.3.5 A Note on Data Aggregation ........ 13
1.4 Measuring Practical Significance in the EEO Context ........ 14
1.4.1 Different Practical Significance Measures ........ 16
1.4.2 Measures of Differences and Ratios ........ 16
1.4.3 Measures of Association ........ 18
1.4.4 Miscellaneous Other Measures ........ 19
1.4.5 A Framework for Adverse Impact Measurement ........ 20
1.5 Conclusion and Looking Toward the Future ........ 22
Recommended Readings ........ 23
Glossary ........ 23
References ........ 24
Cases Cited ........ 25

The first two authors contributed equally to this chapter.

E. Dunleavy (✉)
DCI Consulting Group, 1920 I St NW, Washington, DC 20006, USA
e-mail: edunleavy@dciconsult.com

S. Morris
Department of Psychology, Illinois Institute of Technology, 3105 S. Dearborn, Chicago, IL 60616, USA
e-mail: scott.morris@iit.edu

E. Howard
Strategic Talent Solutions, 135 S. LaSalle St. Suite 3450, Chicago, IL 60603, USA
e-mail: elizabeth@strattalent.com

A variety of procedures for making personnel decisions that are designed to reflect job-relevant factors also tend to result in substantial differences in employment outcomes across racial/ethnic and gender groups (Hough et al. 2001). These statistical disparities, regardless of their cause, are generally described under the heading of "adverse impact." Adverse impact statistics serve as evidence in many employment discrimination lawsuits and can be used to set diversity goals and evaluate the progress of affirmative action programs.

C. Hanvey, K. Sady (eds.), *Practitioner's Guide to Legal Issues in Organizations,*
DOI 10.1007/978-3-319-11143-8_1, © Springer International Publishing Switzerland 2015


Case 5:19-cv-04063-LRR-MAR Document 61-45 Filed 02/05/21 Page 5 of 12

Importantly, adverse impact does not, by itself, prove illegal discrimination, but does create an obligation for the employer to explain existing disparities in a pattern or practice scenario or to justify the use of procedures that cause impact and consider reasonable alternatives in a disparate impact scenario. If those procedures cannot be justified in some fashion, they may be discriminatory. On the other hand, if adverse impact cannot be established, it may be difficult to allege that practices were discriminatory.

As such, the stakes associated with disparity analyses are high. Equal Employment Opportunity Commission (EEOC) investigations, Office of Federal Contract Compliance Programs (OFCCP) compliance evaluations, and employment discrimination litigation associated with adverse impact may incur potentially damaging financial and organizational reputation costs. Consequently, it is advantageous for employers to understand what adverse impact is and how to minimize it while maintaining quality selection systems. From the practitioner's perspective, adverse impact is an important consideration for enforcement, litigation, and affirmative action purposes. Industrial/organizational (I/O) psychologists are also concerned about adverse impact from a broader societal perspective, and many feel obligated to ensure that no individual or group is a victim of discrimination.

The measurement of adverse impact is a topic that has caused some controversy both historically and more recently.[1] Some strategies for measuring adverse impact were codified in the Uniform Guidelines on Employee Selection Procedures (U.S. Equal Employment Opportunity Commission 1978), while others were imported from other areas of case law, or can be found in Equal Employment Opportunity (EEO) agency compliance manuals (Cohen and Dunleavy 2010). Many of these methods have been criticized in the scholarly literature (e.g., Roth et al. 2006). As such, some ambiguity exists regarding what statistics should be computed in an adverse impact analysis and the data structure decisions to frame such analyses.

Toward that end, the purpose of this chapter is to review contemporary adverse impact analyses and the various contextual factors that may affect the appropriateness and usefulness of those analyses. In *Sect. 1*, we introduce relevant EEO context, with particular emphasis on forms of discrimination. In *Sect. 2*, we describe structuring the two by two tables for analysis, with particular emphasis on determining who should be included in the applicant pool and how employment decisions should be treated in analyses, with the overarching goal of conducting analyses that mirror what happened in reality. In *Sect. 3* we introduce statistical significance testing in the adverse impact context, and describe a number of issues to consider with this approach. In *Sect. 4*, we review practical significance measurement in the adverse impact context, and again review issues to consider with this approach. In *Sect. 5*, we conclude with a framework for conducting adverse impact analyses and a brief primer on more complex scenarios.

## 1.1 Context and Background

The concept of adverse impact is likely familiar to employers who are covered by Title VII of the Civil Rights Act of 1964 (CRA) or federal contractors who are covered by Executive Order 11246. In this context, "adverse impact" generally refers to substantial differences in employment decision rates between groups (U.S. Equal Employment Opportunity Commission 1978). These disparities may be of interest in scenarios where the alleged discrimination is either intentional or unintentional. Intentional discrimination is referred to as disparate treatment in the legal realm, and the general notion behind this concept is that protected group status was used to make employment decisions.

Where intentional discrimination is alleged, disparities between favored and disfavored groups may be an important part of the evidence if the allegation focuses on a class of potential victims.

[1] This is in addition to the broader controversy related to the concept of unintentional discrimination more generally (e.g., McDaniel et al. 2011).

This form, called a pattern or practice of discrimination, often involves unstructured and discretionary policies or practices, and is tantamount to *class-wide* disparate treatment. It is defined in the Title VII statute, and was featured in the landmark Supreme Court cases International Brotherhood of *Teamsters v. United States* (1977) and *Hazelwood School District v. United States* (1977). Importantly, substantial differences in employment outcomes between groups are only one of the potential forms of evidence under this theory of discrimination. In many situations, anecdotal evidence of a discriminatory motive is needed as well.

Unintentional discrimination, or disparate impact theory, was developed by the Supreme Court through landmark rulings in *Griggs v. Duke Power* (1971) and *Albemarle Paper Company v. Moody* (1975), and was refined in the Civil Rights Act of 1991. Here, there are *facially neutral* selection criteria that disproportionately exclude higher percentages of one group relative to another. For example, physical requirements tend to exclude a higher percentage of women than men, and cognitive tests tend to exclude a higher percentage of ethnic minorities than nonminorities (Hough et al. 2001).

Note that under a disparate impact theory, adverse impact does not necessarily imply illegal discrimination. Use of a selection practice with adverse impact is permissible if the defendant *can* prove that the practice is job related (i.e., valid) and the plaintiff *cannot* prove there are alternative selection procedures that are as valid, but produce less or no adverse impact. In situations where a specific selection procedure causes adverse impact, the employer must conduct research to support the validity of decisions made using the procedure.[2] The important point is that, regardless of whether an allegation of discrimination is intentional or unintentional, disparities in employment decision rates can be the foundation of high-profile class action lawsuits.

[2] Methods for establishing that a selection procedure is job-related and consistent with business necessity are covered by Loverde and Lahti as well as Tonowski in this volume.

Adverse impact claims can also arise under the Age Discrimination in Employment Act (ADEA), although there are important differences in the context of age discrimination. Adverse impact measurement may be more complex under ADEA given that age can be a continuous as opposed to discrete variable (although only those 40 or older are protected by the act). Also, the Supreme Court has recently ruled that the defense to adverse impact in the ADEA is decidedly different (and easier) as compared to the defense in Title VII (*Meacham v. Knolls Atomic Power Lab* 2008).

Impact analyses are particularly relevant to employers covered by laws and regulations administered by the EEOC and the OFCCP: federal agencies which primarily enforce Title VII of the CRA and Executive Order (EO) 11246, respectively. The EEOC is empowered by the CRA to receive, investigate, and negotiate settlements regarding claims of employment discrimination before a formal discrimination lawsuit is filed. The OFCCP administers the requirement under EO 11246 that federal contractors implement affirmative action plans designed to remedy underrepresentation of women and ethnic minorities in the workforce and ensure equal employment opportunity.

These federal agencies apply both reactive and proactive approaches to investigate claims and enforce nondiscrimination in the workplace. Reactive analyses are conducted in response to a specific allegation, as when the EEOC conducts an investigation following a filed charge of discrimination. Proactive adverse impact analyses are conducted without an allegation of discrimination, in order to anticipate potential discrimination claims and assess barriers to diversity and inclusion.

Many organizations conduct proactive analyses in order to identify vulnerable selection systems so that the systems can be modified or additional evidence collected to ensure defensibility. The OFCCP may require proactive adverse impact analyses as part of an affirmative action plan. The OFCCP regularly conducts audits of contractor employment practices, and may demand conciliation agreements involving finan-

**Table 1.1** Structure of typical applicant flow data

| Reference | Fail test/not selected | Pass test/selected | Total | Proportion in row |
|---|---|---|---|---|
| Minority | $NF_{\text{min}}$ | $NP_{\text{min}}$ | $N_{\text{min}}$ | $P_{\text{min}}$ |
| Majority | $NF_{\text{maj}}$ | $NP_{\text{maj}}$ | $N_{\text{maj}}$ | $1\text{-}P_{\text{min}}$ |
| Total | $NF_{\text{T}}$ | $NP_{\text{T}}$ | $N$ | |
| Proportion in column | $1\text{-}SR_{\text{T}}$ | $SR_{\text{T}}$ | | |

cial remedies to employees if organizations are found to be engaged in systemic discrimination (Cohen and Dunleavy 2009).[3]

Given this background, we now turn to the employment decisions and data that provide the foundation for adverse impact analyses.

## 1.2 Structuring an EEO Analysis: The 2 by 2 Table

Adverse impact analyses can take one of two general approaches: (1) an *applicant flow analysis*, which compares the selection rates of two groups on a particular employment decision (e.g., hiring, promotion, or test passing rates for men vs. women), or (2) a *workforce composition analysis*, which compares the representation of a particular minority group in a specific job to the number of qualified candidates from that group who are available for that job (i.e., the percentage of the qualified labor pool who are women or members of a racial/ethnic minority group).

While a workforce composition analysis can be used to identify underrepresentation of a particular group within a particular job or organization, relative to the available and qualified labor pool, these analyses are often ambiguous with regard to the cause of the disparity, since there is no actual employment decision process being evaluated. A group might be underrepresented because of discriminatory employment practices, but disparities could also result from factors outside the organization's control that impact which individuals apply for positions and accept job offers.[4]

An applicant flow analysis, on the other hand, is better able to pinpoint an employment practice as the mechanism for screening out applicants or employees. As such, applicant flow statistics are generally considered more informative in discrimination claims, because they require the plaintiff to identify the specific employment practice that produced the disparate impact (*Watson v. Fort Worth* 1988). We focus on applicant flow analyses for the remainder of the chapter.

The typical data for an applicant flow analysis can be represented in the form of a $2 \times 2$ contingency table, as illustrated in Table 1.1. The analysis concerns two groups, referred to here as the minority and majority groups, and a dichotomous employment decision, such as passing a test or receiving a job offer. In this table:

- $NP_{\text{min}}$ and $NP_{\text{maj}}$ refer to the number of applicants passing the selection procedure from the minority and majority groups (respectively).
- $NF_{\text{min}}$ and $NF_{\text{maj}}$ refer to the number of applicants failing the selection procedure from each group.
- $N_{\text{min}}$ and $N_{\text{maj}}$ are the marginal totals for each group, or the total number of applicants in the minority and majority groups.
- $NP_{\text{T}}$ and $NF_{\text{T}}$ are the marginal totals for the passing and failing groups, or the total number of applicants who either passed or failed the selection procedure.
- $N$ is the total number of applicants.
- $P_{\text{min}}$ represents the marginal proportion of minority applicants ($N_{\text{min}}/N$).
- $SR_{\text{T}}$ reflects the marginal proportion of all applicants who pass the selection test ($NP_{\text{T}}/ N$).

The fundamental question in an applicant flow analysis is whether the passing rate for the mi-

[3] For more on regulatory coverage and agency issues, please refer to Gutman et al. 2010.

[4] Gutman et al. (2010) note that these types of stock statistic comparison are typically more relevant to pattern or practice claims.

Personality tests that are developed for diagnosing mental disorders should generally not be used for employee selection, and there are plenty of alternatives designed for use with "normal" populations.

- Knowledge tests, common examples of which include written driver tests, nursing boards, realtor certification, or technical job-knowledge tests (e.g., database administration; project management processes; marketing best practices).
- Experience evaluations, such as application forms, minimal qualification standard evaluations, experience reference checks, and biodata tests.
- Physical ability/performance tests, which may include demonstrations of visual acuity, manual dexterity, strength, agility, stamina, etc. (Police and fire departments frequently use such tests).
- Simulations, in which candidates demonstrate their abilities by completing activities that mimic those required on the job for which they are applying. Examples are diverse, depending on the type of job, and can include such things as diagnosing a predetermined technical problem on a piece of test equipment, operating a flight simulator, role playing a sales call, or completing a situational judgment test.
- Performance tests, which are similar to simulations but in which candidates are required to directly demonstrate their ability by performing an actual job-relevant activity, such as typing/keyboarding, shooting at a target, welding, or operating a vehicle.
- Medical tests and drug screens, although these are typically administered post job offer.

### 2.1.2 Assessment

Confusion arises over the distinction between testing and assessment. Assessment is really the broader term, with tests being a form of assessment, although this distinction is not critical to the discussion of validation. In the context of employee selection and evaluation, the terms individual assessment and assessment center are often used to describe processes where several types of tests are used—typically including "high touch" types such as interviews and role plays—and the information is integrated by one or more trained assessors, often to produce a narrative report.

### 2.1.3 Validity and Validation

A common misconception about validity is that it represents how good a test is. Actually, validity refers to the usefulness of a test as a basis for specific decisions or actions.

How test scores will be used to help make decisions about people—that is, the reason for administering the test—is a critical focus of validity and test validation research. A test that is useful for selecting high-potential candidates for a leadership development program may be of little use for selecting welders or long-haul truck drivers. Giving a less extreme example, a test that is useful for selecting entry-level supervisors may be insufficient for identifying C-suite leaders. Thus, although test professionals and users often talk about a "valid test," a critical question that needs to be answered is, "valid for what?"

The example above also highlights that validity is not an inherent characteristic of a test but rather a characteristic of interpretations that can be made based on test information. Decisions based on misinterpreted information drawn from an otherwise "good" test are no more useful than those based on a "bad" test.

The following definitions of validity come from professional standards regarding test use and validation:

- "Validity: The degree to which accumulated evidence and theory support specific interpretations of test scores entailed by proposed uses of a test." (*Standards for Educational and Psychological Testing, American Educational Research Association*, American Psychological Association, and National Council for Measurement in Education (1999).
- "The essential principle in the evaluation of any selection procedure is that evidence be accumulated to support an inference of job relatedness. Selection procedures are demonstrated

to be job related when evidence supports the accuracy of inferences made from scores on, or evaluations derived from, those procedures with regard to some important aspect of work behavior" (*Principles for the Validation and Use of Personnel Selection Procedures*, Fourth Edition, Society for Industrial and Organizational Psychology, Inc. 2003).

Both definitions emphasize that validity pertains to evidence supporting the interpretation of test scores in light of their intended use. The second definition, which is more specifically focused on employment testing, points out that those inferences must accurately reflect one or more important aspects of the job for which they are being made.

As we noted earlier, validity evidence demonstrates that a test score or other information about a job candidate is useful for making employment-related predictions or decisions. Validation of an employment test, then, is the process of accumulating and evaluating validity evidence to determine what and whether job-related interpretations or conclusions are justified.

Much of this chapter will discuss the three most common approaches, or strategies, for establishing the validity of decisions based on test information. These are known as *criterion related, content,* and *construct* validation strategies. We will also discuss alternative strategies for demonstrating validity evidence. These validation strategies are not mutually exclusive; since validation involves the accumulation of evidence, ideally more than one of these approaches is used.

The concept of the **utility** of a test represents attempts to describe and quantify the usefulness of a test in terms that are more meaningful to a business audience. As we will discuss regarding criterion-related validation strategies, a correlation coefficient is a measure of the statistical relationship between two measures. In personnel selection, correlations are usually computed between scores from a test and some meaningful business outcome. A positive correlation means that higher scores on a test are associated with higher levels of a business outcome (for example, job performance), while lower scores are associated with lower levels of that outcome. A negative correlation means the opposite—that higher scores on a test are associated with lower levels of a business outcome, which, in the instance of some outcomes such as theft, absenteeism, and turnover, is a good thing. The closer the correlation coefficient is to 1 or −1, the stronger the relationship; the closer to 0, the weaker the relationship.

A correlation coefficient can be a very good indicator of the validity of decisions based on a test. However, it is a statistical measure with which many people are not familiar and it is not expressed in terms of business outcomes. Early writings about test utility converted correlation coefficients into predictions about "hit rates," demonstrating the usefulness of a test by showing how it could increase the proportion of correct hiring decisions. These types of utility estimates are still useful today. Other measures of utility estimate the differences in outcome levels associated with different test scores, for example, comparing the turnover rates for people with test scores above and below a certain score.

More advanced utility models demonstrate the utility of test usage in financial terms. These models are based on the assumption that higher levels of individual job performance represent greater levels of financial benefit for a company. Thus, use of a test that predicts job performance can be shown to have financial benefits. The most sophisticated of these models incorporate additional information about costs associated with selection processes, hiring volumes, selection rates, success rates of new hires, and average tenure of employees hired to more accurately represent the financial return associated with use of a given test or other selection procedure.

A fundamental challenge for any financially based utility estimate is translating available measures of job performance into accurate estimates of their financial impact on the company. Even using direct financial measures of performance such as sales can be tricky given that not all of the value associated with a sale can be attributed to the performance of the sales person.

A true estimate of the financial value strictly of a sales person's performance would need to factor out not only the costs associated with that person's sales (e.g., product development, manufacturing, logistics, marketing, and sales costs) but also the value added by tangible and intangible product characteristics (e.g., brand reputation, product quality, or product ease of use). That being said, it is usually possible to produce reasonable and likely conservative estimates of business impact of assessment and selection systems using either existing business metrics (e.g., % quota achieved), specialized quality of hire ratings (e.g., new hire time to proficiency, rehireability), or even simple estimates based on salary levels for a given role.

The concept of **adverse impact** is closely tied to, and often confused with, the concepts of discrimination, fairness, and bias. The chapters in this book by Richard Tonowski and by Scott Morris and Eric Dunleavy delve into these topics in greater detail, but we provide a brief overview below:

- Adverse impact refers to a differential, or disparate effect of an employment practice on members of a protected group, for example, a lower hiring rate for certain racial or ethnic minorities, when compared to other groups. (Adverse impact is most often a concern for employers within the USA, given the nature of US employment laws.) Adverse impact is not, in itself, illegal, though evidence of it is often used by government enforcement agencies as preliminary—or prima facie—evidence of potentially unfair practices.

  When adverse impact exists against a protected group, to avoid charges of discrimination and the penalties that go with such charges, an employer may be required to demonstrate the job relatedness of the employment practice. Validity evidence is often used to do so, which is why we mention adverse impact in this chapter. Employers may also be required to demonstrate that they have looked for and not been able to find equally or more valid alternative practices (e.g., tests or other standards) that have less adverse impact.
- **Fairness** and **bias** are closely related concepts. The main difference is that there are standards for bias that can be quantitatively defined, are clearly implied in the federal government's *Uniform Guidelines on Employee Selection Procedures,* and have been accepted by US courts. Fairness, on the other hand, is a more subjective concept. We will discuss bias below. For a description of four possible definitions of fairness, refer to the *Standards for Educational and Psychological Testing,* American Educational Research Association, American Psychological Association, and National Council for Measurement in Education (1999).

  Bias refers to job-irrelevant sources of variance that result in systematic differences in test scores (e.g., higher or lower test scores between two groups that do not reflect true differences in ability). Differences in measures of physical strength between men and women would not be biased if they reflected true differences in men's and women's ability to perform aspects of a job requiring strength. Differences between Whites and Hispanics on a test of critical reasoning skills that were due to differences in the ability to read English would be biased, however, if the job required critical reasoning skills but not the ability to read English.

## 2.2 Legal Context

We will briefly and broadly discuss applicable laws, professional standards, and administrative guidelines that apply to employment testing. By cataloguing and describing these laws and guidelines, we hope to provide a basic orientation and framework for practitioners to appraise their testing and selection programs, and to provide a foundation for further learning. We are not attorneys, and the legal arena can get complex quickly; fortunately, though, in our experience good science and practice is highly consistent with the law. In particular, a strong focus on validity combined with clear documented processes and fair

ners should draw on multiple validation strategies to support the use of selection procedures in making hiring and promotion decisions.

### 8.3.2 Uniform Guidelines on Employee Selection Procedures and Adverse Impact

Based on the *Uniform Guidelines,* employers are obligated to determine if selection outcomes demonstrate adverse impact against any protected group. Adverse impact, under the *Uniform Guidelines,* is measured against the "four-fifths rule." The four-fifths rule is defined as a "selection rate for any race, sex, or ethnic group which is less than four-fifths (4/5) (or 80% percent) of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact, while a greater than four-fifths rate will generally not be regarded by Federal enforcement agencies as evidence of adverse impact" (29 C.F.R. § 1607.4(D)). Stated differently, if the ratio of minority group outcomes is less than 80% of majority group outcomes, adverse impact is considered to be present. Plaintiffs commonly proffer statistical evidence demonstrating selection outcomes violated the four-fifths rule to establish prima facie evidence of adverse impact. However, the four-fifths rule is problematic as a measure of adverse impact in at least two ways. First, it is easily affected by small sample sizes. With small samples, differences in decisions about one or two applicants may substantially change the comparison ratio. Therefore, the four-fifths rule may not always be accepted as determining adverse impact and differences in the comparison ratio greater than the 80% ratio may not be regarded as adverse impact. Second, it is viewed as a rule of thumb and not a recognized statistical test. Consequently, accepted tests of statistical significance are applied to determine whether the challenged practice had a disparate impact on a protected group. Selection procedures that do not result in adverse impact generally do not violate antidiscrimination laws, meaning the employer may usually avoid the scrutiny of regulatory agencies by the use of testing procedures that have no adverse impact.

Much has been written about the use of traditional significance testing as an indicator of adverse impact given the fact that such tests are highly influenced by sample size and other factors (Jacobs et al. 2011b; Jacobs et al. 2012; Murphy and Jacobs 2012) and the issue adds to the argument regarding an update of the *Uniform Guidelines*. Within public safety testing, it is often the case that thousands of candidates are part of the process and even very small differences in test performance will result in statistically significant differences in hiring or promotion rates. In other words, significant differences may be the mere consequence of large sample sizes more so than questionable assessment tools; it is often more about being big than doing something wrong (Jacobs et al. 2012).

The *Uniform Guidelines* address two additional issues that hold significant practical relevance for testing in the public sector. First, if a cut score is used for a test or selection procedure and has adverse impact, the choice of the cut score must be defended (validated). Since a discussion of validating cut scores is beyond the scope of this chapter (as well as the word allocation assigned by the editor for this chapter), the reader is referred to an excellent chapter by Kehoe (2010) and the chapter in this book by Mueller and Munson. Second, when a selection procedure results in adverse impact, the employer is obligated to investigate the availability of alternative selection procedures that are equally valid but demonstrate lesser adverse impact. The *Uniform Guidelines Q&A* (Question 91) clarifies, to some extent, that this investigation should begin with a search of published literature such as test manuals and journal articles, and may also include professionally available unpublished studies. The *Uniform Guidelines Q&A* suggest including a reasonable investigation of suitable alternative selection procedures as part of the validity study (Question 48), but best practice dictates that alternatives be considered at the outset.

While the *Uniform Guidelines* apply whenever a selection procedure has adverse impact against a protected class of individuals, the scientific and professional standards embodied in the *Standards* and the *Principles* set forth best practice recommendations regardless of whether adverse impact exists.